# Exhibit A

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

WEST VIRGINIA INVESTMENT
MANAGEMENT BOARD,

          Plaintiff,

    v.

RESIDENTIAL ACCREDITED LOANS,
INC.; RESIDENTIAL FUNDING
COMPANY, LLC; DEUTSCHE BANK
SECURITIES INC.; and CREDIT SUISSE
SECURITIES (USA) LLC,

          Defendants.

Civil Action No. _10-C-413_

Hon. _Bailey_, Judge

## COMPLAINT

Plaintiff the West Virginia Investment Management Board ("Plaintiff" or the "WVIMB"), by and through its undersigned counsel, as and for its Complaint against Defendants Residential Accredited Loans, Inc. ("RALI"), Residential Funding Company, LLC f/k/a Residential Funding Corporation ("RFC"), Deutsche Bank Securities Inc. ("DBS"), and Credit Suisse Securities (USA) LLC ("CSS"), alleges upon information and belief as to all facts other than as to itself, the following:

### NATURE OF THE ACTION

1.    On or about December 27, 2005, Defendant RALI publicly offered (the "Offering") $549,541,100 in face amount of RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA13 ("2005-QA13 Certificates"), pursuant to a publicly-filed shelf registration statement (the "Registration Statement") and prospectus supplement dated December 27, 2005 (the "Prospectus"). Defendant DBS was the underwriter for the Offering. In August 2007 Defendants DBS and CSS directly sold Plaintiff Class II-A-1 Certificates (the

1

"Certificates") that were issued in the Offering, and which were rated triple-A by both Moody's Investor Service, Inc. ("Moody's"), and Standard & Poor's Ratings Services ("S&P"; "Moody's and "S&P" together are referred to herein as the "Rating Agencies"). This action arises from material misstatements made to, and material information that was withheld from, the WVIMB in connection with its purchase of the Certificates.

2.       The Certificates were issued pursuant to a loan securitization transaction, which is a process by which a "pool" of residential mortgage loans are acquired and grouped together, then sold as "residential mortgage-backed securities" ("RMBS"). The Certificates represented the right to receive a portion of the cash flows generated by the pooled residential mortgage loans. These loans were held out to be so-called Alternative-A ("Alt-A") loans, a term which generally refers to loans to borrowers with solid credit but limited documentation with respect to income and assets that are secured by the borrowers' residences.

3.       The pooled loans underlying the Certificates were purchased by RALI and placed into a special purpose vehicle in the form of a trust (the "2005-QA13 Trust" or "Trust"). The payments of principal and interest due under each mortgage loan were to flow into the Trust and the rights to this cash flow were divided into "tranches," or classes. The value of the Certificates was tied directly to repayment of the underlying mortgage loans, as the principal and interest payments due to investors were secured by and derived from the cash flows from those loans. The classes were placed in a hierarchical structure with the senior classes receiving payments ahead of subordinated junior classes. In this manner the subordinated classes provided a cushion of security for the senior classes, thereby enhancing the senior classes' value.

4.       This manner of structuring the transaction to protect the flow of cash to the senior classes is a form of loss protection known as "credit enhancement." The amount and quality of

2

the senior classes' credit enhancement were supposed to factor significantly in the credit rating assigned to those senior classes, and supposedly were a significant factor in the triple-A rating assigned to the Certificates.

5.      During the period from 2004 to 2007, Defendant RALI was a prolific issuer of RMBS that securitized mortgage loans acquired by its affiliate, Defendant RFC. In 2005 and 2006 alone, RALI issued at least 76 public offerings worth at least $45 billion. Defendants DBS and CSS underwrote many of those offerings. The Rating Agencies rated most if not all of the RALI public offerings; 95% of the 2005-QA13 Certificates received triple-A ratings.

6.      The securitization transaction at issue here was structured jointly by, *inter alia*, Defendants RALI, RFC, and DBS. Together these parties determined the structure of the transaction, including the mortgage loan composition of the collateral pool, and the nature and level of credit enhancement that they claimed was required for each class to satisfy that class's credit rating.

7.      The Rating Agencies also analyzed the mortgage loan composition and credit enhancement in rating the Certificates. They did not, however, perform an independent verification of the quality and nature of the underlying loans; rather, they relied on the representations by RFC and RALI in that regard.

8.      RALI's, RFC's, and DBS's collaborative process resulted in the Certificates receiving triple-A ratings (the highest possible rating) from both Rating Agencies. These ratings, which were set forth in the Prospectus, were a precondition to the issuance of the 2005-QA13 Certificates. The triple-A rating indicated, *inter alia*, that (a) the likelihood of a default in payments of principal or interest on the Certificates was negligible; (b) there was sufficient liquidity to repay the Certificateholders in full in the event of immediate liquidation; and (c) the

3

Certificates were (i) safe, secure, and reliable as a high quality investment; (ii) had a low probability of transitioning to "junk status;" and (iii) had rates of return that were appropriate and reflected the true level of risk.

9.      Defendants adopted the triple-A rating assigned to the Certificates and used it in marketing and selling the Certificates to establish the financial credibility of (a) the Certificates, (b) the structure of the transaction, including the different classes' credit enhancement, and (c) the pricing of the Certificates in the mind of prospective investors such as the WVIMB who make risk-oriented decisions based on the investments' economic viability.

10.     However, unbeknownst to Plaintiff when it purchased the triple-A rated Certificates, the credit risk associated with the Certificates was vastly understated and did not comport with the nearly nonexistent level of risk indicated by the assigned triple-A rating. The mortgage loans underlying the Certificates were originated in a manner that disregarded mortgage loans underwriting guidelines, and were acquired and placed into the Trust's collateral pool by RFC, RALI, and DBS without regard for compliance with such underwriting guidelines. Moreover, the structure of the Offering failed to compensate for the poor-quality collateral with sufficient credit enhancement. Consequently, the Certificates did not, in fact, meet the high level of creditworthiness that was indicated by the triple-A rating. Defendants' issuance and sale of the Certificates as triple-A rated was a material misrepresentation of their true nature and value.

11.     DBS and CSS each sold Certificates to the WVIMB in August of 2007. The Certificates were sold as triple-A rated securities at a price that reflected their purported triple-A rated stature and earning interest at a rate commensurate with their purportedly low-risk rating. In fact, for the reasons set forth in detail herein, there was a systematic disregard of the underwriting standards set forth in the Registration Statement and Prospectus, causing the loans

4

underlying the Certificates to be of lower quality and the Certificates themselves to be higher risk, and thus the triple-A rating was a material misrepresentation of the true nature and value of the Certificates.

12.     The WVIMB bought the Certificates in reliance on their triple-A rating and has suffered losses as a result.  Had the WVIMB known of the misleading nature of the triple-A rating assigned to the Certificates at the time of its purchase, it would not have purchased the Certificates.

13.     The Certificates purchased from DBS and CSS have since dropped in value by over 50%, and have been downgraded by the Rating Agencies to below investment grade, i.e., the level of junk.

## II.     THE PARTIES

### A.     Plaintiff

14.     Plaintiff West Virginia Investment Management Board ("WVIMB") is a domestic public entity organized under the laws of West Virginia, as codified in the West Virginia Investment Management Act, W. Va. Code §§ 12-6-1 – 12-6-17.  The WVIMB is responsible for investing the funds of all of the State's pension plans, the Worker's Compensation and Pneumoconiosis Plan, and various other long-term assets of the State and its political subdivisions.  W. Va. Code § 12-6-1a.  In August 2007 WVIMB purchased over 16.6 million RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA13, Class II-A-1 directly from Defendants DBS and CSS, and has been damaged thereby.

### B.     Defendants

15.     Defendant RALI publicly offered $549,541,100 in face amount of 2005-QA13 Certificates, pursuant to the Registration Statement and Prospectus.  RALI purchased the

mortgage loans for the 2005-QA13 Trust from its affiliate RFC (defined below), and it then assigned those loans to the trustee of the 2005-QA13 Trust for the benefit of the certificateholders. RALI is a Delaware corporation, with its principal place of business at One Meridian Crossings, Minneapolis, MN. It is a subsidiary of Residential Capital, LLC, f/k/a/ Residential Capital Corp. ("ResCap"). At all pertinent times, RALI has transacted business in West Virginia, engaged in a persistent course of conduct and derived substantial revenue in and from West Virginia, causing injury in West Virginia as is more fully set forth in this Complaint.

16.     Defendant RFC is named in the Prospectus as the master servicer of the 2005-QA13 Certificates and also as the entity that acquired all of the mortgages serving as collateral for the 2005-QA13 Certificates, which it conveyed to RALI, and with respect to which RFC has provided certain representations in the Registration Statement and Prospectus concerning the mortgage loans. RFC is a Delaware limited liability company with its principal place of business at One Meridian Crossings, Minneapolis, MN. RFC is a division of ResCap and an affiliate of RALI. RFC is registered to do business in West Virginia.

17.     At and around the time of the Offering, RALI and RFC were run and controlled by the same managerial team. Bruce Paradis was President, Chief Executive Officer, and Director of RALI, and, as such, signed the Registration Statement. He also served as President, Chief Executive Officer, and Director on RFC's three person board, and as Chief Executive Officer of ResCap. Kenneth M. Duncan was Acting Chief Financial Officer (Principal Financial Officer) of both RALI and RFC. Duncan signed the Registration Statement. Ralph T. Flees acted as Controller (Principal Accounting Officer) of both RALI and RFC, and signed the Registration Statement in that capacity. David C. Walker served as Director on the three-person boards of both RALI and RFC, and signed the Registration Statement. Moreover, RALI and

6

RFC, at the time of the Offering, shared the same corporate address and offices. Essentially, RFC controlled RALI's policy and business practices. Moreover, transactions among RALI, RFC, and ResCap were not arm's-length transactions.

18.  Defendant DBS sold Certificates directly to WVIMB on or about August 23, 2007. DBS also served as the sole underwriter for the Offering and for the four other RALI offerings made pursuant to the Registration Statement. DBS is a Delaware corporation with its principal place of business at 60 Wall Street, New York, NY. At all pertinent times, DBS has transacted business in West Virginia, engaged in a persistent course of conduct and derived substantial revenue in and from West Virginia, causing injury in West Virginia as is more fully set forth in this Complaint.

19.  Defendant Credit Suisse Securities (USA) LLC, formerly known as Credit Suisse First Boston, LLC, ("CSS") sold Certificates directly to WVIMB on or about August 27, 2007. In 2006 and 2007, CSS served as the underwriter for at least four RALI offerings of mortgage asset-backed pass-through certificates worth at least $1.7 billion. CSS is a Delaware limited liability company with its principal place of business at 11 Madison Avenue, New York, NY. CSS is registered to do business in West Virginia.

**C.   Relevant Non-Parties**

20.  ResCap was, at all relevant times, a leading residential real estate finance company, and a wholly owned subsidiary of General Motor Acceptance Corporation, LLC ("GMAC"). ResCap has its principal place of business at One Meridian Crossings, Minneapolis, MN.

21.   At the time of the Offering, Bruce Paradis was President, CEO and Director of RALI, and, as such, signed the Registration Statement.  He was also the President and CEO of RFC, and CEO of ResCap.

22.   Moody's, at all relevant times, provided such services as credit rating, securities monitoring, and risk evaluation to investors.  Moody's rated the 2005-QA13 Certificates and assigned them a triple-A rating.

23.   S&P, at all relevant times, provided such services as credit rating, securities monitoring, and risk evaluation to investors.  S&P rated the 2005-QA13 Certificates and assigned them a triple-A rating.

24.   Both the Rating Agencies have been accepted officially by the SEC, and thus by all other state and federal regulators, as nationally recognized statistical rating organizations ("NRSRO").  Due to the numerous regulations that tie corporate conduct to ratings by NRSROs, the Rating Agencies' status as NRSROs effectively provided them with an exclusive credit rating license, and positioned them as gatekeepers for fixed income products.

25.   The Rating Agencies dominate the ratings market, having issued approximately 80% of all outstanding ratings.  They each produce ratings in the form of a letter grade that provides a relative indicator of a financial instrument's creditworthiness.  The Rating Agencies provide an important function, therefore, because they distill complex and highly nuanced information into standard symbols, allowing markets to respond quickly and, more or less, uniformly to changes in ratings. Each gradation may be further refined by a +/- suffix (or in the case of Moody's, the nuanced modification is indicated by a suffix of 1, 2 or 3).  The highest possible rating was AAA (for S&P) and/or Aaa (Moody's).  For purposes of this Complaint, references to "AAA" or "triple-A" are to the highest rating issued by both Moody's and S&P.

8

26.     The Rating Agencies' ratings are intended to measure and predict the probability of default, or loss given default, of an issuer or issuance.[1]   Rated securities are considered "investment grade" as long as they are rated at least a BBB- (for S&P) or Baa (for Moody's). Ratings below investment grade are considered "speculative grade." The ratings continue all the way down to D, or default.

27.     Over the years the Rating Agencies each have maintained that their ratings on structured finance products such as RMBS are consistent with their ratings on traditional corporate bonds and have applied the same rating scale to both.  Thus, a triple-A rating on a corporate bond and a triple-A rating on a structured finance product (such as the Certificates) mean the same thing.

28.     A triple-A rating indicates essentially that the debt security will not default, based in large part on the historical performance of such highly rated debt securities.  In fact, before 2007, Moody's Aaa corporate ratings had a default rate of 0.52%, and S&P's AAA corporate ratings had a default rate of 0.60%.[2]  These top ratings are considered to be the gold standard in fixed income.

29.     Furthermore, the assigned ratings have a direct correlation to market implications for issuer's borrowing costs.  The lower the rating the higher the interest payments will be on the debt security to compensate the investor for taking on the added level of risk.  Similarly, the higher the rating the lower the interest payments will be on the security because of the lower level of risk associated with the investment.

---

[1] U.S. Securities and Exchange Commission, Annual Report on Nationally Recognized Statistical Rating Organizations As Required By Section 6 of the Credit Rating Agency Reform Act of 2006, at p. 37 (2008) ["SEC Annual Report on CRA's"].

[2] *See* H.R. Rep. No. 110-835, at 5 (2008).

## JURISDICTION AND VENUE

30.    The claims asserted in this Complaint arise under West Virginia common and statutory law.

31.    WVIMB is an arm of the State of West Virginia, and therefore not a citizen of the State for diversity purposes.

      a.  The WVIMB operates pursuant to the West Virginia Investment Management Act, W. Va. Code §§ 12-6-1 through 12-6-17, and is subject to significant State oversight and control.

      b.  The key mandate of the WVIMB is to "develop, implement and maintain an efficient and modern system for the investment and management of the State's money." The WVIMB is required to make regular reports to the Legislature and other Executive officials and submit to regular financial audits to ensure that it is operating and investing moneys consistent with governing statutes and in the best interest of the public retirement plans and other public funds. W. Va. Code §§ 12-6-6(a), (d), and 12-6-8(d). The WVIMB is required to transmit to the State Treasurer any funds requested to meet the obligations of the State pursuant to W. Va. Code § 12-b-5(20).

      c.  A judgment in favor of Plaintiff will inure to the benefit of the State of West Virginia.

      d.  The State exercises significant veto power over the WVIMB's actions by controlling the makeup of its governing body. Ten of thirteen members of the Board of Trustees of WVIMB are appointed by the Governor. W. Va. Code § 12-6-3(b). The other three members are the Governor himself, the State Auditor, and the State Treasurer.

The Governor also serves as the Chairman of the Board and the Chief Presiding Officer. W. Va. Code §§ 12-6-3(d), (e).

       e.  Courts in this State recognize the WVIMB as an arm of the State under West Virginia law.  For example, the Supreme Court of Appeals of West Virginia has described the WVIMB as a "public body corporate and government instrumentality."

32.    Personal jurisdiction over all Defendants is proper pursuant to W. Va. Code §§ 31D-5-504, 31D-15-1501(d)(2), and 56-3-33(a) because they each continuously and systematically transact business in West Virginia, derive substantial revenue from services rendered in this State, and/or have committed a tort, in whole or in part, and caused injury in this State.

33.    Venue in this Court is proper under W. Va. Code § 56-1-1(a)(2).  Venue is also proper under W. Va. Code § 56-1-1(a)(6) because the seat of the State government is located within Kanawha County.

## FACTUAL BACKGROUND

34.    Typically, borrowers who require funds to finance the purchase of a house, or to refinance an existing mortgage, apply for residential mortgage loans with a loan originator. Loan originators assess a borrower's ability to make payments on the mortgage loan based on, among other things, the borrower's Fair Isaac & Company ("FICO") credit score. Using a person's FICO score, a loan originator assesses a borrower's risk profile to determine the rate of the loan to issue, the amount of the loan, loan-to-value ("LTV") ratio, and the general structure of the loan.  Borrowers with higher FICO scores are able to receive loans with less documentation during the approval process and have a higher loan-LTV ratio on their mortgage loans.

35.    A loan originator will issue a "prime" mortgage loan to a borrower who has a high credit score and who can supply the required documentation evidencing their income, assets, employment background, and other documentation that supports their financial health. Borrowers who are issued "prime" mortgage loans are deemed to be the most credit-worthy and receive the best rates and structure on mortgage loans.

36.    If a borrower has the required credit score for a "prime" mortgage loan, but is unable to supply supporting documentation of his financial health, then a loan originator will issue the borrower a loan referred to as a "low doc" or Alt-A loan, which is subject to more lenient lending standards than "prime" loans. The interest rate on that loan will be higher than that of a prime mortgage loan and the general structure of the loan will not be as favorable as it would be for a prime borrower. The risk profile of the low doc or Alt-A loan increases because of, among other things, higher LTV, higher debt-to-income ratios, or inadequate documentation of the borrower's income and assets/reserves, but it is not considered as high risk as a "sub-prime" loan.

37.    The most distinctive attribute of Alt-A loans is that borrowers are not required to provide with their applications supporting documentation of their assets or the amount or source of their income. Alt-A loans also include loans where: (i) the LTV ratio exceeds 80% but lacks primary mortgage insurance; (ii) the borrower is a temporary resident alien; (iii) the loan is secured by non-owner occupied property; or (iv) a debt-to-income ratio is above normal limits.

38.    A borrower will be classified as "sub-prime" if the borrower has a lower credit score and higher debt ratios. Borrowers who have low credit ratings are unable to obtain a conventional mortgage because they are considered to have a larger-than-average risk of

12

defaulting on a loan. For this reason, lending institutions often charge interest on sub-prime mortgages at a rate that is higher than a conventional mortgage in order to compensate for assuming increased risk.

39.     Traditionally, the model for a mortgage loan involved a lending institution (i.e., the loan originator) extending a loan to a prospective home buyer in exchange for a promissory note from the home buyer to repay the principal and interest on the loan. The loan originator also held a lien against the home as collateral in the event the home buyer defaulted on the obligation. Under this simple model, the loan originator held the promissory note until it matured for the life of the loan and was exposed to the concomitant risk that the borrower may fail to repay the loan. As such, under the traditional model, the loan originator had a financial incentive to ensure that: (1) the borrower had the financial wherewithal and ability to repay the promissory note; and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note.

40.     The growing demand for mortgages, fueled by low interest rates and low inflation, moved banks and other mortgage lending institutions in the direction of loan securitization to finance the expanding mortgage market. This changed the traditional lending model by severing the link between borrower and lender and permitting lenders to shift the lending risks normally associated with mortgage loans to remote investors in the securitization transaction.

41.     Unlike the traditional lending model, a mortgage securitization involves the sale and securitization of mortgages. Specifically, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage in the financial markets to a third-party

13

financial institution, such as RFC and RALI. By selling the mortgage, the loan originator obtains fees in connection with the issuance of the mortgage, receives upfront proceeds when it sells the mortgage into the financial markets, and thereby has new capital to issue more mortgages. The mortgages sold into the financial markets are typically pooled together and "securitized" into what are commonly referred to as mortgage-backed securities or MBS, and then sold publicly to investors, whereby the investors acquire rights in the income flowing from the mortgage pools. A MBS comprised of residential mortgages is often referred to as "residential mortgage backed securities" or "RMBS." In addition to receiving proceeds from the sale of the mortgage, the loan originator is no longer subject to the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the MBS.

42. When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash-flow is distributed to the holders of the MBS certificates in order of priority based on the specific class or tranche held by the MBS investors. The holders of the highest class or tranche (also referred to as the "senior" class) are the first to receive their share of the mortgage proceeds and also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgage. Concomitantly, because the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower classes, diminished cash flow to the lower classes results in impaired value of the higher classes.

43. This payment priority structure, which provides credit protection–referred to as credit enhancement–to the senior certificates, was devised by issuers and investment banks so that investment grade ratings could be assigned to most of the MBS notwithstanding that they were collateralized by pools of high risk mortgage loans.

14

44. More specifically, "credit enhancement" refers to payment priority, excess collateral, insurance, and/or other agreements designed to provide support to the mortgage collateral underlying mortgage-backed securities and to protect the debt securities in the event of default on the underlying collateral. Secured debt that has sufficient credit support – i.e., appropriate credit enhancement – to receive triple-A ratings is a low-risk debt instrument that sells and trades at prices higher than secured debt that lacks credit support and does not receive a triple-A rating. Credit enhancement is highly material to investors who buy securitized notes, and it was a factor in the WVIMB's decision to buy the Certificates.

45. In the MBS structure, the senior classes that are first in payment priority received the highest investment rating by the Rating Agencies, usually AAA. After the senior class, the middle classes (referred to as mezzanine classes or tranches) next received their share of the proceeds, and, in accordance with their order of priority, were generally rated from AA to BBB by the Rating Agencies. The distribution of the mortgage proceeds continued down the classes through to the bottom tier classes, referred to as equity classes.

46. In the typical securitization transaction, such as the Offering, participants in the transaction are: (1) the servicer of the loans to be securitized; (2) the depositor of the loans in a trust for securitization; (3) the underwriter of the MBS; (4) the entity or trust responsible for issuing the MBS; and (5) the investors in the MBS.

47. The securitization process begins with the sale of mortgage loans by the servicer -- the original owner of the mortgages -- to the depositor, in return for cash. The depositor then sells those mortgage loans and related assets to the trust, in exchange for the trust issuing certificates to the depositor. The depositor then works with the underwriter of the trust to price and sell the certificates to investors.

15

48.    Thereafter, the mortgage loans held by the trusts are serviced, i.e., principal and interest are collected from mortgagors, by the servicer, who earns monthly servicing fees for collecting such principal and interest from mortgagors. After subtracting a servicing fee, the servicer sends the remainder of the mortgage payments to a trustee for administration and distribution to the trust, and ultimately, to the purchasers of the MBS certificates.

49.    Defendants RALI and RFC were a part of GMAC's mortgage finance arm, ResCap, which was one of the largest issuers of MBS in the U.S. and the world by the end of 2005. According to *Inside Mortgage Finance* ("*IMF*"), in 2005 alone, ResCap issued over $56.93 billion of non-agency MBS, making it the fifth largest issuer of such securities; in 2006, the production was increased to $66.2 billion, making ResCap the fourth largest non-agency MBS issuer.

50.    ResCap, through its divisions and subsidiaries, was able to securitize large volumes of mortgage collateral in part because it owned and operated Homecomings Financial LLC ("HFN"), whose business was residential mortgage loan origination.  Specifically, HFN acquired and originated non-conforming (meaning subprime and Alt-A) loans.  HFN provided, on average, one-third of the total mortgage collateral for RALI offerings, including those underwritten by DBS and CSS.

51.    At the time of the Offering, HFN's management overlapped significantly with that of ResCap, RFC and RALI:

      a.   ResCap CEO Davee Olson was one of the three directors of the boards of both HFN and RFC.

      b.   David C. Walker was also one of the three directors of the boards of HFN, RFC, RALI, and ResCap.

    c.  Ralph T. Flees was controller of RFC, RALI and ResCap.

    d.  Kenneth M. Duncan was CFO of HFN, RFC, and RALI.

52.    The 2005-QA13 Trust represented the packaging of 2,054 largely Alt-A residential mortgage loans into approximately $549 million of purportedly "investment grade" RMBS, whose value depended exclusively on the repayment by the borrowers of the principal and interest due on the Trust's mortgage loans. The 2005-QA13 Trust loans were primarily one- to four-family residential hybrid adjustable-rate first lien mortgage loans. Nearly 30% of the 2005-QA13 Trust's loans were originated by HFN.

53.    The parties involved in the RMBS transaction at issue here were RFC, the provider of the loans and loan servicer; RALI, the depositor of the loans; DBS, the underwriter of the issuing trust; the 2005-QA13 Trust as the issuing trust, a special purpose entity set up for the purpose of issuing certificates (or "mortgage pass-through certificates") to the depositor; the trustee of the 2005-QA13 Trust; the Rating Agencies; and the investors who purchased the mortgage pass-through certificates issued by the 2005-QA13 Trust.

54.    Defendant DBS, the underwriter of the Offering, was required to conduct proper due diligence and perform necessary functions relating to the securitization and pricing of the Certificates and the preparation of the Offering documents, including the Registration Statement and Prospectus. DBS hired two outside firms, Clayton Holdings ("Clayton") and the Bohan Group ("Bohan"), to conduct its due diligence review of the mortgage loans.

55.    Indeed, because (a) DBS's obligation to conduct due diligence arose in the context of an initial public offering of the Certificates, which had never been publicly traded and which securitized mortgage loans about which information was not publicly available, (b) DBS had a long-standing business relationship with RALI and RFC, and (c) the Offering was made

17

pursuant to a shelf registration, which permits a much faster turnaround time for a public offering, DBS had a heightened duty of care in the manner in which it conducted its due diligence function.

56.     DBS is currently a named defendant in other pending lawsuits regarding its failure to properly perform its underwriting functions in connection with public offerings of other mortgage-backed certificates during the period from at least 2005 through 2007, including allegations of inadequate underwriter due diligence on the mortgage loans.  For the reasons discussed herein below, DBS also failed to conduct adequate due diligence on the mortgage loans securitized in the Offering.

57.     DBS was extremely familiar with the RMBS market and with the RMBS securitization process because of the vast number of deals that it was integrally involved in both as an issuer of residential mortgages and as an underwriter.  Indeed, in 2005, DBS was ranked twenty-second among non-agency MBS issuers (that is, other than federal government agency issuers) by *IMF*, issuing more than $17 billion MBS.  Moreover, that same year, DBS was ranked eighth in volume of business among non-agency MBS underwriters.   In 2006, DBS climbed two levels in this MBS underwriting ranking when it increased to a volume of $72.765 billion.  Also in 2006 *IMF* ranked DBS, with its $25.328 billion in volume, as the twenty-first largest mortgage securities producer.  In 2007 DBS ranked eighth among the top subprime MBS underwriters.

58.     More specifically, DBS was also extremely familiar with RALI, RFC, and its affiliates, having served as the underwriter for fifteen additional RALI offerings between 2005 and 2007, all of which were rated by Moody's and S&P, and each of which securitized, on average, approximately 2,800 mortgage loans, or collectively, approximately 42,000 loans.  Thus

18

during this time period DBS brought to market approximately $11.9 billion in RALI mortgage backed securities, including the 2005-QA13 Certificates, in connection with which it received significant underwriting fees.

**The 2005-QA13 Certificates**

59.     On the closing date of the 2005-QA13 Trust, RFC sold the underlying mortgage loans to RALI for cash, and the loans then were sold by RALI to the 2005-QA13 Trust, in exchange for the 2005-QA13 Certificates. RFC, RALI and DBS then worked together to structure the Offering and sell the 2005-QA13 Certificates to investors.

60.     Defendants RALI, RFC, and DBS structured the cash flows of the 2005-QA13 Trust into six classes of senior certificates and three classes of subordinated certificates.

61.     Since the time the 2005-QA13 Certificates were issued, RFC, as the loan servicer, has serviced the collateral loans underlying the 2005-QA13 Trust by collecting principal and interest from the borrowers, for which RFC earns monthly fees. RFC sends the net proceeds from the principal and interest payments on the loans to the trustee of the 2005-QA13 Trust for distribution to investors.

62.     The Certificates could not be sold unless they were assigned the highest credit rating by the Rating Agencies, i.e., rated "AAA" by S&P, and "Aaa" by Moody's. This was a condition of issuance set forth in the Prospectus.

63.     RALI, RFC and DBS collaborated in structuring the Certificates, including modifying the capital structure of the 2005-QA13 offering as necessary to enhance the credit loss protection of the Certificates in order for the Certificates to obtain the highest credit rating.

64.     According to sworn testimony provided to Congress's House Committee on Oversight and Government Reform by Raymond W. McDaniel, Chairman and CEO of Moody's,

19

on October 22, 2008 (the "October 2008 Congressional Hearing"), the Rating Agencies' "ratings of structured finance bonds are based primarily on analysis of the transaction's legal structure, the cash flows associated with the assets on which the deal is based and other risks that may affect the bonds' cash flow. Our analysis necessarily depends on the quality, completeness and veracity of information available to us, whether such information is disclosed publicly or provided confidentially to Moody's analysts."

65.   In rating a RMBS, such as the 2005-QA13 Certificates, the Rating Agencies' analysts depend on the issuer to supply them with the relevant information, such as projections, legal documents, and data about priority of claims and collateral characteristics, which is supplemented with other information gathered from public sources. The Rating Agencies obtain this nonpublic information from the issuer at meetings and through other communications.

66.   McDaniels further explained at the October 2008 Congressional Hearing that "[b]efore the RMBS is brought to the Rating Agencies to be rated, information about the underlying loan pool is verified by various parties at several points in the process[,]" including the originator, which verifies underwriting information when it extends the mortgage loan to the borrower, and the underwriter, which "conducts due diligence to verify that the loans in a particular pool meet relevant underwriting standards." He further explained that "[s]eparately, the transaction sponsor (or the original lender) of an RMBS provides representations and warranties to the securitization trust about each of the underlying mortgage loans, including that each loan meets the requirements of applicable laws."

67.   Frank Raiter, S&P's former Managing Director and Head of Residential Mortgage Backed Securities Ratings who left S&P in 2005, also confirmed in sworn testimony at the same hearing that rating agencies do not perform and have not performed their own due

diligence on the data in connection with RMBS transactions. The issuers were "required to do the diligence on their filings," and the rating agencies "relied on the reps and warranties, the guaranties."

68.      Therefore, according to Raiter, the rating can only be as good as the data that is put into the models and there is no independent verification of the data tapes by the rating agencies. Raiter further testified at the October 2008 Congressional Hearing that "[w]e determined that it was better to put the onus on the issuer as we required . . . in reps and warranties."

69.      Thus, to determine how much credit enhancement was required for an investment-grade rating, the Rating Agencies relied on the data provided by RFC, RALI and/or DBS describing the mortgage loans to assess the loans' potential future performance using credit characteristics such as the amount of documentation provided by borrowers to verify their income levels and/or assets and other various loan information, such as principal amount, geographic location of the property, credit history and FICO score of the borrower, the LTV ratio, and type of loan, the amount of equity in the property used as collateral, and whether the borrowers intended to rent or occupy their homes.

70.      Based on the data provided them by DBS, RALI, and/or RFC, Moody's and S&P each assigned approximately 95% of the total 2005-QA13 Certificates issued in the Offering a "AAA" rating, including the Certificates, thus representing that the likelihood of default on loans underlying the Certificates was almost nonexistent. The triple-A ratings remained on the Certificates through Plaintiff's August 2007 purchase dates.

71.      The Certificates were offered publicly pursuant to the Registration Statement, which incorporated by reference the Prospectus filed at the time of the Offering.

72.     RALI, RFC, DBS and the Rating Agencies all had access to and evaluated, or had available to them for evaluation, data pertaining to the credit risks of the loans serving as the underlying collateral, in evaluating the quality of the loans and determining the credit enhancement needed for a triple-A rating.   These parties could interview the loan originators, obtain and review property appraisals, and examine individual loan applications, borrowers' credit reports, or income verifications. Investors, including the WVIMB, did not, and in general, do not have such access.

**Undisclosed Problems With the Collateral and
the Ratings Assigned to the Certificates**

73.     As detailed in the following paragraphs, contrary to the statements in the Registration Statement and the Prospectus, many of the mortgage loans underlying the 2005-QA13 Certificates were bad quality because they were originated and acquired in complete disregard for the underwriting guidelines set forth therein.   As a consequence, the loan data provided to the Rating Agencies for analysis in their determination of the different classes' ratings, was inaccurate; the credit enhancement, which was determined based upon the inaccurate data, was insufficient; and the triple-A rating assigned to the Certificates, which Defendants adopted and used to market the Certificates and without which the Certificates could not have been sold, was inflated and unreasonable.

1.     **RFC Acquired Lower Quality Mortgage Loans That
       Suffered High Delinquency And Default Rates**

74.     In 2005, if not earlier, RFC was engaged in a systematic pattern and practice whereby it provided its affiliates, including RALI, mortgage loans that did not comport with applicable underwriting standards, were improperly underwritten, and were of poor quality and likely to default.   These poor quality and improperly underwritten loans were sold to the 2005-

QA13 Trust and were securitized by the 2005-QA13 Trust's Certificates.

75.    RFC acquired mortgage loans individually and in bulk. RFC encouraged its employees to adopt a cavalier approach to the quality of loans that it acquired for securitizations. For example, according to a former RFC employee who worked as a subprime mortgage trader from 1998 to March 2007, RFC's sales force was paid commissions that were based on volume and not quality of loans acquired from originators and others.

76.    This former trader further explained that ResCap and RFC (which the trader describes as interchangeable) "needed to continue to purchase more loans for the securitizations, or they would have been out of business." Starting in 2005, this former trader noted that higher risk loans were being purchased; guideline exceptions were allowed "especially if the seller was a good client;" and originators permitted ResCap and RFC to conduct a review of only 20% of total loans before purchase, down from 25%.

77.    According to another former RFC employee who worked in sales as a pricing analyst until 2009, RFC would buy billions of dollars of loans from RFC's mortgage loan vendors, and therefore care was taken by RFC to keep those mortgage vendors happy.

78.    Indeed, according to this same former pricing analyst, it was commonly known at RFC that RALI's and RFC's President and CEO Bruce Paradis directly encouraged RFC traders who had reservations about the quality of an originator's loans to buy the loans anyway. According to this former RFC employee, "it was not uncommon for Paradis to 'go down to the desk, put his arm around the trader, and say, 'come on, why not,'" because Paradis wanted to keep the loan vendors happy, particularly the big ones who "RFC bought billions of loans from. It was hard to say no."

2.    **MBIA Insurance Corporation's Lawsuit Against RFC**

79.    Further evidencing RFC's pattern and practice of disregarding underwriting guidelines for loans that it securitized, such as those that were collateralized in the Offering, is a lawsuit brought by MBIA Insurance Corporation ("MBIA") against RFC for failing to ensure that mortgage originators complied with applicable laws and underwriting guidelines.

80.    MBIA is a monoline insurance company which provided additional credit enhancement in the form of guaranteed payment streams on securitized tranches that were made up of mortgages acquired by RFC.  On October 15, 2008, MBIA filed a complaint against RFC in the New York State Supreme Court for New York County, captioned *MBIA Insurance Corp. v. Residential Funding Co. LLC*, Index No. 603552/08 (the "MBIA Complaint").  The MBIA Complaint asserts claims of breach of contract, negligent misrepresentation, and fraud, among others, based on MBIA's agreement to insure five public securitizations of residential mortgaged loans, with a total approximate value of $11.3 billion, that were each sponsored by RFC.  DBS and CSS each underwrote one of the subject transactions.

81.    The MBIA Complaint alleges that MBIA insured the transactions based on representations made to MBIA by RFC regarding the quality of the underlying loans.  Because the transactions performed poorly, with high delinquencies and default rates, in January 2008 MBIA began to investigate the underlying loans that made up the transactions.  Although RFC tried to hinder the investigation and provided MBIA with incomplete records, MBIA nonetheless discovered that less than 7% of the delinquent loans were originated or acquired in material compliance with RFC's representations and warranties to MBIA, including representations that the loans conformed to RFC's putative underwriting guidelines.

82.    Through its analysis of the loans, MBIA discovered that RFC engaged in the

24

following improper practices that caused the loans to fail to conform to its underwriting guidelines and resulted in the loans in the collateral pool experiencing extraordinarily high rates of delinquencies and default:

    a.  RFC entered into "negotiated commitments," whereby it committed to purchase mortgage loans from a loan originator that failed to comply with RFC's underwriting guidelines, notwithstanding the noncompliance. RFC put these non-compliant mortgage loans in its loan pools, in knowing disregard of their noncompliance with its underwriting guidelines.

    b.  RFC participated in "bulk purchase programs" whereby RFC purchased from a seller a bulk amount of previously-originated mortgage loans that were owned by that seller. RFC took no steps to verify whether the bulk-purchased loans complied with RFC's underwriting guidelines, and in fact, many of the loans bought in bulk did not comply with RFC's underwriting guidelines. Nonetheless, RFC misrepresented to MBIA that such loans were in compliance.

    c.  RFC used an automated electronic loan underwriting program that failed to analyze proposed mortgage loans on the basis of RFC underwriting guidelines, which led to violations of RFC's underwriting guidelines.

    **3.**    **The Principal Originators for the Offering
Disregarded Stated Mortgage Loan Underwriting Guidelines**

83.    RFC did little if anything to verify the documentation associated with loans from originators or to ensure that originators complied with applicable laws. For this reason, RFC now is attempting to recover from various originators for what it admits are bad loans.

84.    According to the Prospectus, approximately 70% of mortgage loans underlying the 2005-QA13 Trust and the Certificates came from three originators: HFN, First National Bank

25

of Nevada ("FNB Nevada"), and American Mortgage Network, Inc. HFN and FNB Nevada are now defunct. As described below, these originators originated loans through inadequate underwriting procedures.

              **a.**      **HFN**

85.    HFN, based in Minneapolis, Minnesota, is an indirect subsidiary of GMAC and a subsidiary of ResCap. From 1995 to 2008 HFN served as ResCap's primary wholesale lender. In Fall of 2008, HFN was abruptly shut down by ResCap. According to the Prospectus, HFN provided 29.2% of the loans underlying the 2005-QA13 Certificates, and 18.1% of the loans underlying the Certificates purchased by the WVIMB.

86.    According to the subprime mortgage trader formerly employed by RFC, RFC traders made exceptions for HFN loans that were higher risk and therefore did not fit the standard underwriting guidelines.

87.    Following the WVIMB's purchase of the Certificates, disclosures emerged which reflected HFN's systematic disregard for the underwriting guidelines set forth in the Registration Statement and Prospectus, its practice and policy of favoring riskier, fee-driven mortgage lending including sub-prime, Alt-A and other types of mortgage loans and inflating revenue via hidden prepayment penalties and fees.

88.    In mid-2008, the Federal Trade Commission (the "FTC") commenced an investigation into HFN's policies and practices after an FTC staff review of HFN's mortgage loan data report pursuant to the Home Mortgage Disclosure Act, 12 U.S.C. §§ 2801-2810, indicated that African American and Hispanic borrowers paid more for mortgage loans than non-Hispanic Whites. According to a letter from the FTC to HFN's counsel, the investigation focused on whether the underwriting risk and the credit characteristics of the borrowers justified

the reported disparities in loan price:

> Homecomings originated the vast majority of its loans through independent brokers and Homecomings' policy and practice was to set the risk-based price and other terms of its brokered loans. In addition, Homecomings' policy and practice was to allow brokers to assess discretionary charges on these loans, within certain limits set by Homecomings. These discretionary charges took the form of (1) fees charged at the time of origination, including broker points and fees, and (2) higher interest rates, in return for which Homecomings paid brokers yield spread premiums.
>
> Based on an extensive investigation, which included obtaining and analyzing Homecomings' full and complete loan data, the staff's statistical analyses of the data show that, on average, Homecomings charged African-American and Hispanic borrowers substantially more for home purchase and refinance loans than similarly-situated non-Hispanic whites. The staff further determined that these disparities were caused by Homecomings' policy and practice of allowing its brokers broad discretion to determine the amount of discretionary fees charged to borrowers in addition to the risk-based price. The staff concluded that the disparities in these discretionary charges are substantial, statistically significant, and cannot be explained by any legitimate underwriting or credit characteristics in violation of the FCOA and the FTC Act.

89.    On September 3, 2008, before the FTC could complete its investigation, ResCap announced that it was shutting its wholesale mortgage origination operations, thereby closing down HFN. The FTC explained in a January 22, 2009 letter closing the investigation that "[d]uring the course of this investigation, Homecomings ceased originating mortgage loans and stated it has no intention to resume mortgage lending in the future."

90.    In a March 5, 2009 article titled "Shaky Loans May Spur New Foreclosure Wave," the *Portland Tribune* recounted the events leading up to the massive failures throughout the U.S. mortgage lending industry – including the role of HFN:

> "In order to keep your market share, you had to be more aggressive," said Tim Boyd, who sold subprime loans in the Portland area for six years and then Alt A loans for seven years for Homecomings Financial.

"The main focus was doing Alt A because that's where the money was," said Boyd, who left the industry.  A loan officer arranging a $300,000 Option ARM loan could collect $10,500 in fees, he said.

Lenders could unload shaky loans by selling them to investors, who often resold them in what amounted to a worldwide game of financial musical chairs.  Wall Street's insatiable appetite for more loans kept the pipeline filled, even if the deals weren't always sound.

"The V.P.s came down to the office beating the drums about Option ARMs," urging mortgage brokers to sell them to customers, Ridge said. "I had Wachovia march through there; I had GMAC."

\* \* \*

He said he knows of loan officers who'd tell title agents to keep quiet about Option ARM loan provisions during document-signing time.

"They'd tell the title officer, 'Don't go over this; just glean through it quickly and get the thing signed.'"

Tim Boyd said he drew the line at selling Option ARMs because he saw how that could get people into trouble. "It made me sick," he said.

### b.    FNB Nevada

91.    According to the Prospectus, FNB Nevada provided 26.1% of the loans underlying the 2005-QA13 Certificates, and 33.8% of the loans underlying the Certificates purchased by the WVIMB.  As detailed below, a recent federal investigation concluded that since at least 2002, FNB Nevada was plagued by poor underwriting standards and high-risk mortgage lending activities.

92.    On July 25, 2008, FNB Nevada was declared insolvent by the Office of Comptroller of the Currency ("OCC") and put into receivership by the FDIC.  The Office of Inspector General of the Department of the Treasury ("OIG") subsequently launched an investigation into the causes of FNB Nevada's insolvency, and on February 27, 2009, issued its conclusions in an audit report (the "Audit Report").  The Audit Report, at 2, blamed the failure of

28

FNB Nevada on "significant losses" resulting from, *inter alia*, the residential mortgage operations.   The Audit Report found that those losses occurred because of "inadequate management controls over credit underwriting and administrative practices, and inadequate risk management."

93.   The Audit Report listed specific problems as including:

- The boards of directors did not require bank management to **conduct mortgage-banking activities in a safe and sound manner,** as evidenced by the lack of concentration limits, **weak risk management controls, and risky lending policies.**

- Bank capital was strained by the **large volumes of high-risk mortgage product** originated and sold on a monthly basis.

\*\*\*

- **Mortgage underwriting and credit risk management deficiencies, along with a concentration in high-risk mortgage lending activities,** would likely adversely impact asset quality.

*Id.* at 15 (emphasis added).

94.   The Audit Report noted that FNB Nevada's management was dominated by its Chairman Raymond Lamb, who, according to the OCC "created a culture within the bank[] that they considered to be high-risk and one that emphasized growth and profits over appropriate risk management."   Audit Report at 10.   Furthermore, in 2004, the Chairman's son, Patrick Lamb, became president of the residential mortgage division, despite having no previous mortgage experience.   According to the Audit Report, "the bank['s] chief financial officer told FDIC that the owner's son ran the mortgage division as a closed, separate operation and wanted no intervention from anyone."   *Id.* at 11.   Patrick Lamb resigned from his position at the bank in September 2007.

29

95.    These problems first were noted internally by the OCC in 2002 but were not publicly revealed.   These problems persisted through 2006 and included "underwriting weaknesses in the origination and later the administration of loans." *Id.* at 16.  By 2007, the situation with FNB Nevada "had deteriorated to the point where [FNB Nevada] became a supervisory concern," and the OCC concluded in December 2007 that "a formal enforcement action needed to be taken." *Id*. However, the OCC delayed doing so because it did not want to jeopardize additional funding that FNB Nevada was trying to obtain.

96.    Accordingly, contrary to assurances in the Prospectus that the originators selected to provide loans to the 2005-QA13 Trust employed, *inter alia,* "underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral," this was not the case for the loans acquired from FNB Nevada, a bank that both the OCC and the OIG later determined had inadequate underwriting and risk management controls and extremely risky mortgage lending policies during the period from 2002 through 2007.

97.    RFC acquired one-third of the loans underlying the Certificates from FNB Nevada.  Many if not all of these loans were originated without regard for any underwriting standards and were high-risk loans that did not support a triple-A rating, and which in fact subsequently defaulted.

### c.    American Mortgage Networks

98.    American Mortgage Network, Inc. provided 14.6% of the loans underlying the 2005-QA13 Certificates, and 17.8% of the loans underlying Group II of the 2005-QA13 Certificates.  It too has been brought to task for supplying noncompliant mortgage loans.  In 2009 it was sued in federal court in Colorado for breach of contract for allegedly supplying the

plaintiff with mortgage loans that were underwritten as a result of material misstatements and omissions.

4.     **The Offering Documents Also Failed To Disclose DBS's Inadequate Due Diligence With Respect To Originator Compliance With Mortgage Loan Underwriting Guidelines**

99.     The loans underlying the Certificates were supposed to be originated or sold to RFC in accordance with standards set forth in the Prospectus and Registration Statement.

100.     DBS conducted inadequate due diligence as underwriter of the Offering with respect to whether the originators complied with the loan underwriting guidelines described in the Registration Statement and Prospectus.  According to a former DBS employee who worked in the mortgage trading group starting in early 2005 and was familiar with the Offering, DBS's underwriting process for the Offering consisted solely of a "general due diligence" check of the loan pool, and not a comprehensive analysis "by any stretch."  It was simply a review to make sure the loans were generally what RALI said they were.  This former DBS employee pointed out that at DBS, given that the loans were Alt-A, "the risk is somewhat assumed," so extensive due diligence was not required.

101.     DBS hired external firms Clayton and Bohan to review whether the loans included in RMBS that it underwrote, including the Offering and other RALI offerings underwritten by DBS, were in compliance with the loan originators' represented standards.

102.     In June of 2007, the New York Attorney General ("NYAG") subpoenaed documents from Clayton and Bohan related to their due diligence efforts on behalf of the investment banks that underwrote mortgage backed securities, in connection with whether investment banks held back information they should have provided in the disclosure documents. Similar subpoenas were issued by the SEC and by Massachusetts and Connecticut regulators.

31

103.   In a January 12, 2008 article titled "Inquiry Focuses on Withholding of Data on Loans," *The New York Times* reported that:

> An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.
>
> Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms.  But the banks did not disclose the details of these reports to credit-rating agencies or investors.
>
> The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments, according to people with knowledge of the matter.  Charges could be filed in coming weeks.
>
> * * *
>
> The inquiries highlight Wall Street's leading role in igniting the mortgage boom that has imploded with a burst of defaults and foreclosures.  The crisis is sending shock waves through the financial world, and several big banks are expecting to disclose additional losses on mortgage-related investments when they report earnings next week.
>
> As plunging home prices prompt talk of a recession, state prosecutors have zeroed in on the way investment banks handled exception loans.  In recent years, lenders, with Wall Street's blessing, routinely waived their own credit guidelines, and the exceptions often became the rule.
>
> It is unclear how much of the $1 trillion subprime mortgage market is composed of exception loans.  Some industry officials say such loans made up a quarter to a half of the portfolios they saw.  In some cases, the loans accounted for as much as 80 percent.  While exception loans are more likely to default than ordinary subprime loans, it is difficult to know how many of these loans have soured because banks disclose little information about them, officials say.
>
> Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.

32

* * *

Mr. Cuomo, who declined to comment through a spokesman, subpoenaed several Wall Street banks last summer, including Lehman Brothers and **Deutsche Bank**, which are big underwriters of mortgage securities; the three major credit-rating companies: Moody's Investors Service, Standard & Poor's and Fitch Ratings; and a number of mortgage consultants, known as due diligence firms, which vetted the loans, among them Clayton Holdings in Connecticut and the Bohan Group, based in San Francisco. Mr. Blumenthal said his office issued up to 30 subpoenas in its investigation, which began in late August. [Emphasis added.]

* * *

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws.   But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort Worth that verifies borrowers' incomes for mortgage companies, said **lenders and investment banks routinely ignored concerns raised by these consultants.** [Emphasis added.]

"Common sense was sacrificed on the altar of materialism," Mr. Meadows said, "We stopped checking."

104.    On January 27, 2008, Clayton revealed that it had entered into an agreement with

the NYAG for immunity from civil and criminal prosecution in the state of New York in

exchange for agreeing to provide additional documents and testimony regarding its due diligence

reports, including copies of the actual reports provided to its clients.  On the same day, both the

*New York Times* (Anderson, J. and Bajaj, V., "Reviewer of Subprime Loans Agrees to Aid

Inquiry of Banks," Jan. 27, 2008), and the *Wall Street Journal* ran articles describing the nature

of the NYAG's investigation and Clayton's testimony.  The *Wall Street Journal* reported that the

NYAG's investigation is focused on "the broad language written in prospectuses about the risky

nature of these securities changed little in recent years, even as due diligence reports noted that

the number of exception loans backing the securities was rising."  *The New York Times* reported

that Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending

33

standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

105.   A March 23, 2008 *Los Angeles Times* article titled "Subprime Watchdogs Ignored" reported that Clayton and Bohan employees "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports" as follows:

> The loan reviewers' role was just one of several safeguards – including home appraisals, lending standards and ratings on mortgage-backed bonds – that were built into the country's mortgage-financing system. But in the chain of brokers, lenders and investment banks that transformed mortgages into securities sold worldwide, no one seemed to care about loans that looked bad from the start. Yet profit abounded – until defaults spawned hundreds of billions of dollars in losses on mortgage-backed securities.
>
> "The investors were paying us big money to filter this business," said loan checker Cesar Valenz. "it's like with water. If you don't filter it, it's dangerous. And it didn't get filtered."
>
> As foreclosures mount and home prices skid, the loan-review function, known as "due diligence," is gaining attention. The FBI is conducting more than a dozen investigations into whether companies along the financing chain concealed problems with mortgages. And a presidential working group has blamed the subprime debacle in part on a lack of due diligence by investment banks, rating outfits and mortgage-bond buyers.

106.   Indeed, as reported by the *Los Angeles Times*, "[e]arly in the decade, a securities firm might have asked Clayton to review 25% to 40% of the sub-prime loans in a pool, compared with typically 10% in 2006… By contrast, loan buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans examined, Bohan President Mark Hughes said."

34

107.   A November 1, 2009 *McClatchy Newspapers* article entitled "Why Did Goldman

Stop Scrutinizing Loans It Bought" quoted Bohan employees who described how investment

banking firms told them to disregard underwriting guidelines:

> Before they bought pools of thousands of mortgages, Goldman and other
> Wall Street firms hired contractors to comb through sample batches of the
> loans to weed out unsound of fraudulent applications.
>
> Not much weeding occurred, however, several of the contractors said,
> because the Wall Street firms had agreed to accept mortgage lenders'
> relaxed credit guidelines.
>
> Melissa Toy and Irma Aninger, among scores of contract risk analysts
> who thumbed through mortgage files for the San Francisco-based Bohan
> Group from 2004 to 2006, said that supervisors overrode the bulk of their
> challenges to shaky loans on behalf of Goldman and other firms.
>
> *  *  *
>
> Aninger, whose job was to review the work of other contract analysts, said
> that she objected to numerous applications for loans that required no
> income verification, her supervisor would typically tell her, "You can't
> call him a liar...You have to take (his) word for it." "I don't even know
> why I was there," she said, "because the stuff was gonna get pushed
> through anyway."
>
> Toy said she concluded that the reviews were mostly "for appearances,"
> because the Wall Street firms planed to repackage "bogus" loans swiftly
> and sell them as bonds, passing any future liabilities to the buyers.  The
> investment banks and mortgage lenders each seemed to be playing "hot
> potato," trying to pass the risks "before they got burned," she said.
>
> *  *  *
>
> John Talbott, a former Goldman investment banker and the author of a
> new book, "The 88 Biggest Lies on Wall Street," said "it wasn't a
> mistake" when illegal immigrants got home mortgages.
>
> The lenders, he said, "just wanted somebody, anybody to sign a note" so
> they could sell it to Wall Street, where ratings agencies that were paid
> hefty fees by the investment banks bestowed triple-A grades or their
> equivalent on most subprime bonds.

"It's not just unethical," Talbott said of the chain of profiting subprime players extending from real estate appraisers to Wall Street. "It's totally criminal."

**5.    The Certificates Were Securitized By Poor Quality Loans**
**That Suffered High Delinquency And Default Rates**

108.    The delinquency rates for loans underlying both the 2005-QA13 Certificates and the Certificates dramatically increased soon after WVIMB bought its Certificates, as demonstrated by the two charts below.   The following chart demonstrates the abysmal performance of one-third of all loans that were securitized by the 2005-QA13 Trust.   By December 2009, the percentage of loans in default had tripled to 15%, while nearly 18% of all loans were in foreclosure or bankruptcy, an increase by a factor of <u>ten</u>:

| Date | % of Loans Delinquent | % of Loans in Foreclosure/ Bankruptcy | Total % Loans Delinquent and in Foreclosure/Bankruptcy |
|---|---|---|---|
| August 22, 2007 | 5.35% | 1.89% | 7.25% |
| August 25, 2008 | 8.86% | 9.54% | 18.41% |
| August 25, 2009 | 11.73% | 17.29% | 29.03% |
| December 22, 2009 | 15.02% | 17.66% | 32.68% |

109.    The next chart shows the similarly abysmal performance of one-third of all loans that served as collateral for the supposedly low-risk, triple-A rated Certificates.   By December 2009, the percentage of loans in default had nearly tripled, to 14.7%, while over 18% of all loans were in foreclosure or bankruptcy, an increase by a factor of <u>ten</u>.   Overall, the total percentage of delinquencies and foreclosures increased fivefold, to over 33%:

| Date | % of Loans Delinquent | % of Loans in Foreclosure/ Bankruptcy | Total % Loans Delinquent and in Foreclosure/Bankruptcy |
|---|---|---|---|
| August 22, 2007 | 5.39% | 1.85% | 7.25% |
| August 25, 2008 | 8.75% | 9.42% | 18.17% |
| August 25, 2009 | 11% | 17.64% | 28.64% |
| December 22, 2009 | 14.70% | 18.38% | 33.09% |

110. The actual abysmal performance of the underlying collateral during the two years following the purchase by the WVIMB stands in stark contrast to the Certificates' assigned triple-A rating. In fact, delinquency and bankruptcy and foreclosure rates for the underlying loans skyrocketed to a level for which the inadequate credit enhancement was unable to compensate.

111. That nearly one-third of the Certificates' collateral is either delinquent or in default is attributable directly to RFC's failure to comply with underwriting standards, and, as discussed below, by the other Defendants' conduct in selecting the loans for the Trust.

### 6. The Rating Agencies Were Provided Inaccurate Data to Use in their Analysis of the Loans and Associated Credit Risk

112. As discussed above, RALI, RFC, and/or DBS provided mortgage loan data to the Rating Agencies and the Rating Agencies relied upon these entities to provide them with an accurate set of data.

113. Moody's CEO McDaniels testified under oath at the October 2008 Congressional Hearing that it "is now clear that at least some of the loan-level information we and investors received was inaccurate."

114. Privately, McDaniels admitted at a September 10, 2007 Moody's Managing Director's Town Hall Meeting (the "Moody's Managing Director's Town Hall Meeting"), attended by Moody's managing directors and other senior executives, and hosted by McDaniel

37

and President Brian Clarkson, that "loosening of underwriting standards" was a problem in 2005 and that:

> We're on notice that a lot of things that we relied on before just weren't true. The problem is, what are you going to do. At the end of the day, we relied on reps and warrantees [sic] that no loans were originated in violation of any state or federal law. We know that's a lie. If none were originated in violation of any predatory lending law, we know that's a lie. So what are you going to do about it. We can't rely on what people tell us anymore[.] ...
>
> There's a lot of fraud that's involved there, things that we didn't see.

115.   McDaniels gave his management team advice for how to proceed in the future: "We've got to be more skeptical. We've got to doubt what we're hearing more aggressively than we might be inclined to, but it is difficult to try to calibrate how much information is good information and how much is bad . . . if they're breaking the law, which they are doing, I mean they are violating reps and warrantees [sic]. . . .  People are doing that [lying to the rating agencies]."

116.   At this same meeting, Moody's President, Brian Clarkson, pointed out to senior management that "we're being asked to figure out how much everybody lied. . . . I mean if all of the information was truthful and comprehensive and complete, we wouldn't have an issue here."

117.   As discussed above, RALI and RFC obtained loans that were underwritten with a systematic disregard for applicable underwriting standards. As a result, inaccurate information regarding the true nature of these loans was transmitted to the Rating Agencies, and thus the triple-A ratings assigned to the Certificates were inaccurate and unreasonably inflated, and falsely characterized the Certificates as a virtually risk free investment.

**The Truth Concerning the Junk
Nature of the Certificates Emerges**

118.    On April 4, 2008, Moody's put the Certificates on review for possible downgrade from its initial rating of Aaa, its highest rating, citing "higher than anticipated rates of delinquency, foreclosure, and REO [real estate owned properties] in the underlying collateral relative to credit enhancement levels."

119.    On September 2, 2008, Moody's announced that it had downgraded the Certificates by a shocking eleven levels on its rating scale, from Aaa to Baa2, citing "higher than anticipated rates of delinquency, foreclosure, and REO in the underlying collateral relative to credit enhancement levels."  Baa2 is described by Moody's as "speculative grade," which is below investment grade.

120.    Only five months later, on February 20, 2009, Moody's once again dropped the rating for the Certificates, this time by another six levels, to Caa2, based on "current ratings, level of credit enhancement, collateral performance and updated pool-level loss expectations relative to current level of credit enhancement."  With this additional and significant downgrade Moody's purportedly took into account credit enhancement provided by seniority, cross-collateralization, excess spread, time tranching, and other structural features within the senior note waterfall.  Caa2 is described by Moody's as "in poor standard."

121.    On February 24, 2009, S&P put the Certificates on "negative watch" but retained the AAA rating, stating that "The downgrades reflect our belief that credit enhancement for the affected classes will be insufficient to cover projected losses due to increased delinquencies and the current condition of the housing market."

122.    On July 24, 2009, S&P downgraded its rating on the Certificates by an astonishing 17 levels, from AAA to CCC, meaning it perceived a likelihood of default.  Only

39

four months later, it reduced its rating another six levels to D, meaning that in its view, the Certificates were in default.

123.    As a general matter, a rating downgrade of even one level, such as, for example, from Aaa to Aa (Moody's scale), is considered material to the financial condition of the rated security or entity. Here, the magnitude of the rating downgrade was unprecedented: in the case of Moody's, a rating downgrade by 17 levels over the course of only five months, and, in the case of S&P, by 17 levels in one downgrade. In relative short time, Moody's downgraded the Certificates from Aaa, meaning virtually no default and maximum safety, to Caa2, meaning below investment grade and in poor standing. S&P reduced its estimate of the Certificates' creditworthiness in one fell swoop, dropping it from the maximum safety of AAA all the way down to D, meaning the bond is in default. In other words, Moody's and S&P considered the Certificates to be junk bonds. Such an unprecedented and dramatic reversal in the financial assessment of the creditworthiness of the Certificates by S&P and Moody's underscores that these securities were defective at the start, and certainly at the WVIMB's time of purchase.

124.    As Frank Raiter, the former head of RMBS ratings at S&P, testified under oath at the October 2008 Congressional Hearing, "Triple-As had historically been very stable ratings through time. And so there was an implicit compact, if you will, that the triple-A was to be something that was to last at least for several years without losing that rating. And when you see something go from triple-A to a low rating in such a short period of time, clearly that's evidence of a massive mistake somewhere."

**The Material Misrepresentations and Omissions in the Registration Statement and Prospectus**

125.    As described below, the Registration Statement and Prospectus contained misrepresentations and omissions concerning mortgage loan underwriting guidelines, the credit

40

enhancement supporting the Certificates, and the credit ratings assigned to the Certificates.

    **1.**    **Misrepresentations and Omissions Concerning
Mortgage Loan Underwriting Guidelines**

    126.   The Prospectus, at 12, indicated the importance of loan underwriting practices and

procedures to ensure compliance with applicable state and federal law and regulations:

> [RALI] expects that the originator of each of the mortgage loans will have
> applied, consistent with applicable federal and state laws and regulations,
> underwriting procedures intended to evaluate the borrower's credit
> standing and repayment ability and/or the value and adequacy of the
> related property as collateral.

    127.   **False and Misleading Information:** These statements were materially false and

misleading because, as discussed above, in fact, RALI and RFC had no expectation that the

originators would apply "underwriting procedures intended to evaluate the borrower's credit

standing and repayment ability and/or the value and adequacy of the related property as

collateral." Rather, as discussed above, HFN, FNB Nevada, and American Mortgage Networks

systematically disregarded applicable loan underwriting guidelines and therefore did not and

could not properly evaluate "the borrower's credit standing and repayment ability and/or the

value and adequacy of the related property as collateral."

    128.   The Prospectus, at 19, explained the criteria RFC used to select the mortgage

originator, referred to as "mortgage collateral seller," from whom it acquired mortgage loans:

> In determining whether to approve a mortgage collateral seller, [RFC]
> generally considers, among other things: the financial status of the
> mortgage collateral seller; the previous experience of the mortgage
> collateral seller in originating mortgage loans and its potential origination
> volumes; the prior delinquency and loss experience of the mortgage
> collateral seller (if available); the underwriting standards employed by the
> mortgage collateral seller and its quality control procedures; and, if
> applicable, the servicing operations of the mortgage collateral seller.

    129.   **False and Misleading Information:** These statements were materially false and

misleading because, as discussed above, these criteria were not relevant to RFC's process used in selecting mortgage collateral sellers, as demonstrated by its selection of HFN, FNB Nevada, and American Mortgage Networks as originators for loans to serve as collateral for the 2005-QA13 Trust.

130.    The Prospectus, at 16, stated that the loans RFC purchased were originated in accordance with the underwriting standards of either RFC or the seller:

> The sellers who sell to [RFC] or the designated seller pursuant to master commitment agreements will represent to [RFC] or the designated seller that the mortgage loans have been originated in accordance with underwriting standards agreed to by [RFC] or the designated seller, as applicable.

131.    **False and Misleading Information:** These statements were materially false and misleading because, as discussed above, mortgage loans acquired by RFC from HFN, FNB Nevada, and American Mortgage Networks were not originated in accordance with applicable underwriting standards.   In fact, applicable underwriting standards were systematically disregarded, and RFC acquired these loans without regard for whether they complied with underwriting standards.

132.    According to the Prospectus, at 14, a loan will be considered in compliance with underwriting standards even if one or two specific criteria are not satisfied, so long as "other factors compensated for" those lacking criteria, or there was substantial compliance "based on an overall qualitative evaluation:"

> With respect to the depositor's underwriting standards, as well as any other underwriting standards that may be applicable to any mortgage loans, such underwriting standards typically include a set of specific criteria by which the underwriting evaluation is made. However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually. Rather, a mortgage loan will be considered to be originated in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in

substantial compliance with the underwriting standards. For example, a mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards.

133.   **False and Misleading Information:** These statements were materially false and misleading because, as discussed above, mortgage loans acquired by RFC from HFN, FNB Nevada, and American Mortgage Networks were not originated in accordance with applicable underwriting standards.   In fact, applicable underwriting standards were systematically disregarded, and RFC acquired these loans without regard for whether they complied with underwriting standards.

134.   In the Prospectus at 14, RFC represented that it employed a variety of methods to review its mortgage loans to ensure that the loans complied with underwriting standards as follows:

The level of review by Residential Funding Corporation, if any, will vary depending on several factors. Residential Funding Corporation, on behalf of the depositor, typically will review a sample of the mortgage loans purchased by Residential Funding Corporation for conformity with the applicable underwriting standards and to assess the likelihood of repayment of the mortgage loan from the various sources for such repayment, including the mortgagor, the mortgaged property, and primary mortgage insurance, if any.

135.   **False and Misleading Information:** These statements were materially false and misleading because, as discussed above, in fact, mortgage loans acquired by RFC from HFN, FNB Nevada, and American Mortgage Networks were not originated in accordance with applicable underwriting standards.   In fact, applicable underwriting standards were systematically disregarded, and, on a systematic basis, RFC acquired these loans without regard for "conformity with the applicable underwriting standards and to assess the likelihood of

43

repayment of the mortgage loan from the various sources for such repayment, including the mortgagor, the mortgaged property, and primary mortgage insurance."

136.   According to the Prospectus at 16, "[a] portion of the mortgage loans typically will be reviewed by Residential Funding Corporation or by a designated third party for compliance with applicable underwriting criteria."

137.   **False and Misleading Information:** This statement was materially false and misleading because, as discussed above, it failed to disclose that RFC acquired mortgage loans from HFN, FNB Nevada, and American Mortgage Networks that were not originated in accordance with applicable underwriting standards.  In fact, applicable underwriting standards were systematically disregarded, and RFC acquired these loans without regard for whether they complied with underwriting standards.

138.   The Prospectus provided, at 16, that a portion of the Trust's loans would be purchased by RFC through "negotiated transactions," but assured investors that nonetheless, applicable underwriting standards would be followed in connection with those loans:

> A portion of the mortgage loans will be purchased in negotiated transactions, which may be governed by master commitment agreements relating to ongoing purchases of mortgage loans by Residential Funding Corporation or the designated seller. The sellers who sell to Residential Funding Corporation or the designated seller pursuant to master commitment agreements will represent to Residential Funding Corporation or the designated seller that the mortgage loans have been originated in accordance with underwriting standards agreed to by Residential Funding Corporation or the designated seller, as applicable. Some other mortgage loans will be purchased from Expanded Criteria Program Sellers who will represent to Residential Funding Corporation or the designated seller that the mortgage loans were originated under underwriting standards determined by a mortgage insurance company or third-party origination system acceptable to Residential Funding Corporation or the designated seller.

44

139.   **False and Misleading Information:** These statements were materially false and misleading because, as discussed above, many of the loans RFC purchased through negotiated commitments or bulk transactions violated RFC's underwriting guidelines, *see* ¶¶ 75, 82, *supra*. Moreover, in fact, applicable underwriting standards were systematically disregarded, and RFC acquired these loans without regard for whether they complied with underwriting standards.

140.   The Prospectus further provided, at S35-S36, that RFC purchased loans in accordance with an "Expanded Criteria Program" for borrowers who did not meet traditional guidelines, but that nonetheless, RFC warranted that such loans were originated in accordance with adequate underwriting standards, as follows:

> In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide to the original lender pertinent credit information concerning the mortgagor.

> * * *

> Prior to assigning the mortgage loans to the depositor, Residential Funding will have reviewed the underwriting information provided by the mortgage collateral sellers for most of the mortgage loans and, in those cases, determined that the mortgage loans were generally originated in accordance with or in a manner generally consistent with the underwriting standards described in the Seller Guide. With regard to a material portion of these mortgage loans, this review of underwriting information by Residential Funding was performed using an automated underwriting system. Any determination described above using an automated underwriting system will only be based on the information entered into the system and the information the system is programmed to review.

141.   **False and Misleading Information:** These statements were materially false and misleading because, as discussed above, many of the loans RFC purchased in accordance with the "Expanded Criteria Program" were not adequately documented and the underwriting guidelines associated with this program were systematically disregarded.

142.   According to the Prospectus at 16-17, RFC used an automated underwriting

45

system to evaluate the loans it purchased, which it warranted it utilized in a manner that produced accurate data and results, as follows:

> In recent years, the use of automated underwriting systems has become commonplace in the residential mortgage market. Residential Funding Corporation evaluates many of the mortgage loans that it purchases through the use of one or more automated underwriting systems. In general, these systems are programmed to review most of the information set forth in Residential Funding Corporation's Seller Guide as the underwriting criteria necessary to satisfy each underwriting program. In the case of the Expanded Criteria Program, the system may make adjustments for some compensating factors, which could result in a mortgage loan being approved even if all of the specified underwriting criteria in the Seller Guide for that underwriting program are not satisfied.

* * *

> . . . Mortgage loans that have been approved by the automated underwriting system, and submitted to Residential Funding Corporation for purchase may be reviewed to verify that the information entered by the mortgage collateral seller accurately reflects information contained in the underwriting documentation. For most mortgage collateral sellers, Residential Funding Corporation will verify the accuracy of the information with respect to a sample of that mortgage collateral seller's mortgage loans.

143.   **False and Misleading Information:** These statements were materially false and misleading because, as discussed in ¶¶ 82 above, the automated underwriting system was fundamentally flawed and as a result RFC purchased loans that utterly failed to comply with RFC's underwriting guidelines.

### 2.   Misstatements Regarding the Triple-A Ratings

144.   The Prospectus, at S85, discussed the ratings of the Certificates:

> It is a condition of the issuance of the Senior Certificates (other than the Class R Certificates), that they be rated "AAA" by Standard & Poor's, a division of The McGraw-Hill Companies, Inc., Standard & Poor's or S&P, and "Aaa" by Moody's Investors Service, Inc. or Moody's. [. . .]

> Standard & Poor's ratings on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of payments required

46

under the pooling and servicing agreement. Standard & Poor's ratings take into consideration the credit quality of the mortgage pool, structural and legal aspects associated with the certificates, and the extent to which the payment stream in the mortgage pool is adequate to make payments required under the certificates. Standard & Poor's rating on the certificates does not, however, constitute a statement regarding frequency of prepayments on the mortgages. See "Certain Yield and Prepayment Considerations" in this prospectus supplement. The rating on the Residual Certificates only addresses the return of its Certificate Principal Balance and interest on the Residual Certificates at the related pass-through rate.

The rating assigned by Moody's to the offered certificates address the likelihood of the receipt by the offered certificateholders of all distributions to which they are entitled under the pooling and servicing agreement. Moody's ratings reflect its analysis of the riskiness of the mortgage loans and the structure of the transaction as described in the pooling and servicing agreement. Moody's ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the mortgage loans.

145.    **False and Misleading Information:** The above statements were false and misleading because they failed to reveal that, due to a systematic disregard of underwriting guidelines, Defendants provided the Rating Agencies with false information regarding the true quality of the loans underlying the Certificates. Due to this misinformation, any rating issued by the Rating Agencies, including the triple-A ratings, would be inaccurate, and would not reflect the true creditworthiness of the Certificates.

146.    The Prospectus, at S16-S17, indicating that the value of the Certificates was closely correlated to their assigned rating, stated that "[i]f the performance of the mortgage loans is substantially worse than assumed by the rating agencies, the ratings of any class of the certificates may be lowered in the future. This would probably reduce the value of those certificates."

147.    **False and Misleading Information:** The above statement was false and misleading because it failed to reveal that, as a result of a systematic disregard of underwriting

47

guidelines, RFC and RALI provided the Rating Agencies with false information regarding the quality of the loans underlying the Certificates. As a result, at the time the Certificates were issued, the triple-A ratings did not accurately reflect the creditworthiness of the Certificates and was inflated, and the value of the Certificates, as indicated by their market price in particular, was overstated. Accordingly, due to the true risk inherent in the Certificates, not only was it likely that the rating would be lowered in the future, but the Certificates should never had been offered as triple-A rated securities in the first place.

### 3. Misstatements Regarding Credit Enhancement

148.   The Prospectus, at 43, described the credit enhancement provided for the Certificates.

> Credit support for each series of certificates may be comprised of one or more of the following components. Each component will have a dollar limit and will provide coverage with respect to Realized Losses that are:
> - Defaulted Mortgage Losses;
> - Special Hazard Losses;
> - Bankruptcy Losses; and
> - Fraud Losses.
>
> ***
>
> As described in this prospectus and in the accompanying prospectus supplement,
> - coverage with respect to Defaulted Mortgage Losses may be provided by a mortgage pool insurance policy,
> - coverage with respect to Special Hazard Losses may be provided by a special hazard insurance policy,
> - coverage with respect to Bankruptcy Losses may be provided by a bankruptcy bond and
> - coverage with respect to Fraud Losses may be provided by a mortgage pool insurance policy or mortgage repurchase bond.
>
> In addition, if stated in the applicable prospectus supplement, in lieu of or in addition to any or all of the foregoing arrangements, credit enhancement may be in the form of a reserve fund to cover those losses, in the form of subordination of one or more classes of certificates as described under "Subordination," or in the form of a certificate insurance policy, a letter of credit, a mortgage pool insurance policy, surety bonds or other types of

48

insurance policies, other secured or unsecured corporate guarantees or in any other form as may be described in the accompanying prospectus supplement, or in the form of a combination of two or more of the foregoing. Coverage may also be provided by representations made by Residential Funding Corporation or the depositor. If stated in the accompanying prospectus supplement, limited credit enhancement may be provided to cover Defaulted Mortgage Losses with respect to mortgage loans with LTV ratios at origination of over 80% which are not insured by a primary insurance policy, to the extent that those losses would be covered under a primary insurance policy if obtained, or may be provided in lieu of title insurance coverage, in the form of a corporate guaranty or in other forms described in this section. As described in the pooling and servicing agreement, credit support may apply to all of the mortgage loans or to some mortgage loans contained in a mortgage pool.

In addition, the credit support may be provided by an assignment of the right to receive cash amounts, a deposit of cash into a reserve fund or other pledged assets, or by banks, insurance companies, guarantees or any combination of credit support identified in the accompanying prospectus supplement. Credit support may also be provided in the form of an insurance policy covering the risk of collection and adequacy of any Additional Collateral provided in connection with any Additional Collateral Loan, as limited by that insurance policy. As described in the pooling and servicing agreement, credit support may apply to all of the mortgage loans or to some mortgage loans contained in a mortgage pool.

149.   **False and Misleading Information:** The above statements were materially false and misleading because they failed to reveal that the credit enhancement for the Certificates was inadequate, because credit enhancement had been calculated based on inaccurate information regarding the mortgage loans underlying the Certificates as a result of RFC's, RALI's, and DBS's systematic disregard of underwriting guidelines and their inclusion of mortgage loans in the collateral pool without regard for those loans' compliance with applicable underwriting guidelines.

**DBS and CSS Faced Significant Financial Troubles Starting in 2007**

150.   DBS and CSS have each experienced significant financial losses due to their respective MBS involvement.

151.   Defendant DBS, at the time of the sale of the Certificates to the WVIMB, was facing mounting financial losses in the billions of dollars attributable to its MBS holdings. DBS's serious financial troubles in the MBS area did not begin to surface until on or around October 3, 2007, when *Bloomberg News* and *The New York Times* reported that DBS expected to write-down $3.1 billion in loans and mortgage backed assets.  On July 31, 2008, as reported by *Reuters*, Deutsche Bank AG announced another $3.6 billion in write-downs, primarily due to DBS's overexposure to U.S. RMBS.  The July 2008 write-down brought DBS's total write-downs to more than $11 billion.

152.   In 2005, according to *IMF*, CSS issued $45.1 billion of MBS and was ranked fifth among top non-agency MBS underwriters for $89.163 billion.  In 2006, CSS produced $30.196 billion of MBS, ranking fourteenth among top non-agency MBS issuers and seventh among non-agency MBS underwriters ($69.37 billion).

153.   In 2006 and the first half of 2007 Defendant CSS was the underwriter on at least four RALI offerings, which brought to market RALI RMBS, which securitized collectively 6,052 mortgage loans, valued at approximately $1.8 billion.  These offerings were rated by Moody's and S&P.  At least one-third of the mortgages securitized in these offerings were acquired from HFN, and suffered from the same inadequacies as those mortgages acquired from HFN for the 2005-QA13 Trust.  As the underwriter on these offerings, CSS was required to conduct proper due diligence and perform necessary oversight function programs in the underwriting, securitization, and preparation of the offering documents in those offerings.

154.   Starting in the latter half of 2007, CSS's involvement in MBS offerings took a heavy toll on its financial performance.  In November 2007, CSS's parent company Credit Suisse Group ("Credit Suisse") announced a write-down of $1 billion in structured products including residential mortgage backed securities.  For its third quarter 2007, ended September 30, 2007, Credit Suisse reported a 31% drop in income and a total write-down of $1.98 billion, largely due to its heavy involvement in the subprime mortgage industry.   In April 2008, Credit Suisse reported an additional $5.2 billion write-down and its first loss in five years, as result of its exposure to the mortgage industry. On October 17, 2008, *The New York Times* reported that CSS, in an effort to remain viable without seeking federal government financial aid, raised $8.75 billion of new capital through Qatar Investment Authority.

155.   CSS is currently a named defendant in separate lawsuits brought by two monoline insurance companies, MBIA and AMBAC Assurance Company ("AMBAC"), who separately agreed at CSS's request to provide external credit enhancement for RMBS offerings valued together at over $1 billion.  Both lawsuits assert that CSS, the underwriter of the subject offerings, misrepresented the attributes of the securitized loans, failed to perform adequate due diligence on the mortgage loans, and ignored strict underwriting guidelines for the loan selection, among other things.   CSS is also currently a named defendant in other pending lawsuits regarding its failure to properly perform its underwriting functions in connection with public offerings of other mortgage-backed certificates during the period from at least 2005 through 2007, including allegations of inadequate underwriter due diligence on the mortgage loans.

## COUNT I

### Violation of the West Virginia Uniform Securities Act,
### W. Va. Code § 32-4-410(a)(2)
### (Defendants DBS and CSS)

156.  Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.  This claim is brought pursuant to the West Virginia Uniform Securities Act, W. Va. Code § 32-4-410(a)(2), and is asserted against Defendants DBS and CSS.

157.  Defendants DBS and CSS are each "sellers" within the meaning of §§ 32-4-401(l) and 32-4-410(a)(2).

158.  The Certificates are "securities" within the meaning of §§ 32-4-401(n) and 32-4-410(a)(2).

159.  Defendants DBS and CSS each sold the Certificates to the WVIMB by means of untrue statements of a material fact and/or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, as described above, in violation of W. Va. Code § 32-4-410(a)(2).  Specifically, Defendants each sold the Certificates by means of a triple-A rating which was a material misrepresentation of the creditworthiness of the Certificates.

160.  Plaintiff WVIMB did not know of these untruths and/or omissions at the time of its purchase of the Certificates.

161.  As a result, Plaintiff has suffered a loss in connection with its purchase of the Certificates and hereby seeks to tender the Certificates to DBS and CSS and recover the consideration paid for the security, together with interest at nine percent per year from the date of

payment, costs and reasonable attorneys' fees, less the amount of any income received on the security.

162.    In accordance with § 32-4-410(e), Plaintiff has brought this action within three years from the date of its purchase of the Certificates from Defendant DBS and within three years from the date of its purchase of the Certificates from Defendant CSS.

## COUNT II

### Negligent Misrepresentation
### (Against Defendants RALI, RFC, DBS, and CSS)

163.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

164.    Defendants RALI, RFC, DBS, and CSS are liable to Plaintiff for negligent misrepresentations made in the course of their respective businesses.

165.    In connection with their preparation and public dissemination of the Registration Statement and Prospectus, RALI, RFC, and DBS each misrepresented that (a) the mortgage loans underlying the Certificates were originated pursuant to applicable underwriting standards, (b) the Certificates had credit enhancement sufficient to compensate for the default risk of the underlying loans and thus warrant a triple-A rating, and (c) the triple-A rating provided therein was thus an accurate representation of the creditworthiness of the Certificates.

166.    RALI, RFC, and DBS each knew and contemplated at the time of preparing and disseminating the Registration Statement and Prospectus and selling the Certificates to the public investors that the misstatements therein would be employed and relied upon by purchasers of the Certificates.

167.    RALI, RFC, and DBS also each had reason to know that, as of August 2007, when the WVIMB purchased the Certificates, the credit quality of the underlying loans

53

securitized by the Certificates had not improved but was worsening. Accordingly, RALI, RFC, and DBS each had reason to know that the credit quality of the Certificates was misrepresented, both at the time of issuance and in August 2007.

168.    Because CSS had underwritten at least four RALI offerings, it had reason to know of RFC's and RALI's practice of acquiring loans that were originated without regard for applicable underwriting standards, and thus CSS had reason to know that the Certificates were overvalued and did not warrant a triple-A rating. Accordingly, when CSS sold the triple-A rated Certificates to the WVIMB, CSS negligently misrepresented the true value of the Certificate.

169.    Plaintiff justifiably relied on the misrepresentations of RALI, RFC, DBS, and CSS when it purchased the Certificates, and as a direct and proximate result thereof, has been damaged in an amount to be determined at trial.

170.    This claim was brought within two years after Plaintiff became aware, through the exercise of reasonable due diligence, that the negligence of RALI, RFC, DBS, and CSS caused its injury.

### COUNT III

### Common Law Fraud
### (Defendant RALI and RFC)

171.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if set forth fully herein.

172.    This is a claim for common law fraud against Defendants RALI and RFC.

173.    Defendant RALI purchased 100% of the underlying loans from RFC, and, as the issuer of the Certificates, filed and publicly disseminated the Registration Statement and Prospectus. RFC and RALI each were involved integrally in the structuring, pricing and public offering of the Certificates.   Defendants RALI and RFC knew or recklessly made

54

misrepresentations that (a) the mortgage loans underlying the Certificates were originated pursuant to applicable underwriting standards, (b) the Certificates had credit enhancement sufficient to compensate for the default risk of the underlying loans and thus warrant a triple-A rating, and (c) the triple-A rating provided therein was thus an accurate representation of the creditworthiness of the Certificates.

174.    Moreover, Defendants RALI and RFC each also knew or recklessly disregarded that when WVIMB purchased the Certificates in August 2007, the credit quality of the underlying loans securitized by the Certificates, and therefore of the Certificates themselves, had not improved but was worsening.

175.    Defendants RALI and RFC each were motivated to conceal the truth about the creditworthiness of the Certificates, and had the opportunity to do so, for the following reasons:

> a. The Offering was not an isolated event but rather one of five public offerings made pursuant to the Registration Statement with a total value of approximately $2.283.6 million. Had RALI and RFC disclosed the truth about systematic disregard of underwriting standards, the value of the Certificates, and the assigned rating, it would have jeopardized the other Offerings as well.
>
> b. Indeed such disclosures would have jeopardized much more than the RALI offerings underwritten by DBS in the fall of 2005. During the period from 2004 to 2007, RALI was a prolific issuer of RMBS similar to the 2005-QA13, that were made up of mortgage loans acquired by RFC. In 2005 and 2006 alone, RALI issued at least 76 offerings worth at least $45 billion. RFC and RALI, and ultimately GMAC, profited substantially from the business of acquiring hundreds

55

of thousands of residential mortgage loans and spinning them off in securitization to the unwitting public.

c. As emphasized by CEO Bruce Paradis to RFC employees, RFC's goal in acquiring enough mortgage loans to feed the fast pace of RALI offerings was quantity over quality; yet every one of these securitizations was conditioned upon the receipt of a triple-A rating. Therefore, any public statement by RFC or RALI that in fact the collateral loans were not the quality that they were presented to be, and that the Certificates in fact did not warrant a triple-A rating, and were worth much lass than the high rating implied, would have ended RALI's ability to issue MBS and terminated GMAC's profitable mortgage finance line of business.

d. The Offering of the 2005-QA13 Certificates was conditioned upon the Certificates' receipt of a triple-A rating. RALI and RFC received substantial fees from the Offering that were based on the price at which the Certificates were brought to market. If the Certificates were accurately rated to reflect the true undisclosed risk of default, the Certificates would not have been marketable at the price at which they were sold, and the deals would not have closed, depriving those involved substantial fees.

e. RFC and RALI faced the risk of holding a portfolio of high risk mortgage loans, and attendant losses, if they were not able to close the deals and transfer the risks of loss to the unsuspecting public.

176. The misstatements above were relied upon justifiably by Plaintiff when it purchased the Certificates, and were a contributing factor in Plaintiff's decision to purchase the Certificates. Plaintiff would not have purchased the Certificates at the price that was paid had it

known that (a) the loans securitized by the Certificates were originated through a systematically flawed underwriting process, (b) the Certificates lacked credit enhancement sufficient to compensate for the lower quality loans to warrant a triple-A rating, and (c) due to these problems, the triple-A rating provided therein was an inaccurate representation of the true creditworthiness of the Certificates and caused the price of the Certificates to be artificially inflated.

177.    When the Certificates ultimately were downgraded, and the true credit risks regarding investment in the Certificates were revealed, the market price of the Certificates dropped.  Plaintiff has suffered damages as a result of Defendant RALI's and RFC's misconduct.

178.    This claim was brought within two years after Plaintiff became aware, through the exercise of reasonable due diligence, of RALI's and RFC's fraudulent conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Under Count I, awarding Plaintiff rescissionary damages plus statutory interest, reasonable expenses and costs, and attorneys' fees;

B.      Under Counts II and III, awarding Plaintiff damages, including pre and post-judgment interest, and punitive damages, in an amount to be determined at trial, plus reasonable expenses and costs, and attorneys' fees; and

C.      Awarding such equitable/injunctive or other and further relief as the Court deems just and proper.

## DEMAND FOR A TRIAL BY JURY

Plaintiff demands a trial by jury in this action.

Dated:  March 4, 2010

THE WEST VIRGINIA INVESTMENT
MANAGEMENT BOARD
By Counsel

Joshua I. Barrett (W.V. State Bar No. 252)
J. Timothy DiPiero (W.V. State Bar No. 1021)
Rudolph L. DiTrapano (W.V. State Bar No. 1042)
**DITRAPANO BARRETT
& DIPIERO, PLLC**
604 Virginia Street, East
Charleston, West Virginia 25301
E-mail: jbarret@dbdlaw1.com
E-mail: tdipiero@dbdlaw1.com
Telephone: (304) 342-0133
Facsimile: (304) 342-4605

Jacqueline Sailer
Gregory B. Linkh
**MURRAY, FRANK & SAILER LLP**
275 Madison Avenue, 8th Floor
New York, New York 10016
E-mail: jsailer@murrayfrank.com
E-mail: glinkh@murrayfrank.com
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

Mark W. Carbone (W.V. State Bar No. 6291)
**CARBONE & BLAYDES, PLLC**
2442 Kanawha Blvd., East
Charleston, WV 25314
E-mail: wvjustice@aol.com
Telephone: (304) 342-3650

*Special Assistant Attorneys General and Counsel for Plaintiff
The West Virginia Investment Management Board*

58

APR. 7. 2010  2:09PM   CIRCUIT CLERK                                    NO. 6616   P. 2

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E
Charleston, WV  25305

FILED

2010 MAR 11  PM 4: 53

CATHY S. GATSO A CLERK
KANAWHA CO CIRCUIT COURT



**Natalie E. Tennant**
Secretary of State
Telephone: 304-558-6000
Toll Free: 866-SOS-VOTE
www.wvsos.com

|  |  |
|---|---|
| Control Number: | 292061 |
| Defendant: | Residential Accredited Loans, Inc. |
|  | 3/8/2010 |
| Civil Action: | 10-C-412 |
| Certified: | 9171923790001000225583 |

Cathy Gatson, Circuit Clerk
Kanawha County Courthouse
111 Court Street
Charleston WV  25301-2500

I am enclosing:

| | | |
|---|---|---|
| _____ summons | _____ affidavit | _1_ summons and complaint |
| _____ notice | _____ answer | _____ summons returned from post office |
| _____ order | _____ cross-claim | _____ summons and amended complaint |
| _____ petition | _____ counterclaim | _____ 3rd party summons and complaint |
| _____ motion | _____ request | _____ no return from post office |
| _____ suggestions | _____ certified return receipt | _____ notice of mechanic's lien |
| _____ interrogatories | _____ request for production | _____ suggestee execution |
| _____ original | _____ request for admissions | _____ Other |
| _____ subpeona duces tecum | | |

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in the name and on behalf of your unauthorized foreign corporation.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in your name and on behalf as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper. Please do not call the Secretary of State's office.*

Sincerely,

*Natalie E Tennant*

3-4

Natalie E. Tennant
Secretary of State

APR. 7. 2010  2:09PM    CIRCUIT CLERK                    NO. 6616   P. 3

**SUMMONS**

FILED

2010 MAR 11  PM 4: 53

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

CATHY S. [illegible] CLERK
KANAWH [illegible] [illegible] COURT

| | | |
|---|---|---|
| **WEST VIRGINIA INVESTMENT MANAGEMENT BOARD** | ) ) ) | |
| Plaintiff | ) ) | CIVIL ACTION NO. _10 C-413_ |
| v. | ) ) ) | Bailey |
| | | Summons |
| **RESIDENTIAL ACCREDITED LOANS, INC.; RESIDENTIAL FUNDING COMPANY, LLC.; DEUTSCHE BANK SECURITIES (USA) LLC.,** | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Type of Service: Secretary of State

To the above-named Defendant:    **RESIDENTIAL ACCREDITED LOANS, INC.**
One Meridian Crossings
Minneapolis, MN 55423-3938

IN THE NAME OF THE STATE OF WEST VIRGINIA, you are hereby summoned and required to serve upon Joshua I. Barrett, J. Timothy DiPiero and Rudolph L. DiTrapano of Di Trapano, Barrett & DiPiero, PLLC, Special Assistant Attorneys General, whose address is 604 Virginia Street, East, Charleston, West Virginia 25301, an answer, including any related counterclaim you may have, to the complaint filed against you in the above styled civil action, a true copy of which is hereby delivered to you. You are required to serve your answer within twenty (30) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint and you will be thereafter barred for asserting in another action any claim you may have which must be asserted by counterclaim in the above styled civil action.

Dated: _3|5|10_

_Cathy S Gatson_
Clerk of Court
By _C Wood_

APR. 7. 2010  2:09PM    CIRCUIT CLERK                                    NO. 6616   P. 4

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E
Charleston, WV  25305

FILED

2010 MAR 11  PM 4: 52

CATHY S. ...  ... ERK
KANAWH... ... COURT



**Natalie E. Tennant**
Secretary of State
Telephone: 304-558-6000
Toll Free: 866-SOS-VOTE
www.wvsos.com

|  |  |
|---|---|
| ControlNumber: | 292062 |
| Defendant: | Deutsche Bank Securities, Inc. |

Cathy Gatson, Circuit Clerk
Kanawha County Courthouse
111 Court Street
Charleston WV  25301-2500

|  |  |
|---|---|
|  | 3/8/2010 |
| Civil Action: | 10-C-412 |
| Certified: | 9171923790001000225590 |

I am enclosing:

| _____ summons | _____ affidavit | <u>1</u> summons and complaint |
|---|---|---|
| _____ notice | _____ answer | _____ summons returned from post office |
| _____ order | _____ cross-claim | _____ summons and amended complaint |
| _____ petition | _____ counterclaim | _____ 3rd party summons and complaint |
| _____ motion | _____ request | _____ no return from post office |
| _____ suggestions | _____ certified return receipt | _____ notice of mechanic's lien |
| _____ interrogatories | _____ request for production | _____ suggestee execution |
| _____ original | _____ request for admissions | _____ Other |
| _____ subpeona duces tecum |  |  |

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in the name and on behalf of your unauthorized foreign corporation.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in your name and on behalf as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper. Please do not call the Secretary of State's office.*

Sincerely,

*Natalie E Tennant*

S-6

Natalie E. Tennant
Secretary of State

SUMMONS                    FILED

                                          2010 MAR 11  PM 4: 52

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

                                          CATH  S     TS    CLERK
WEST VIRGINIA INVESTMENT          )       KANAW     C       COURT
MANAGEMENT BOARD                  )
                                  )       CIVIL ACTION NO.  10-C-412
        Plaintiff                 )
                                  )
        v.                        )       Summons
                                  )
RESIDENTIAL ACCREDITED            )
LOANS, INC.; RESIDENTIAL          )
FUNDING COMPANY, LLC.;            )
DEUTSCHE BANK SECURITIES          )
(USA) LLC.,                       )
                                  )
Defendants.                       )
                                  )

                    Type of Service: Secretary of State

To the above-named Defendant:    DEUTSCHE BANK SECURITIES, INC.
                                 60 Wall Street
                                 New York, NY 10005

        IN THE NAME OF THE STATE OF WEST VIRGINIA, you are hereby summoned and
required to serve upon Joshua I. Barrett, Timothy DiPiero and Rudolph L. DiTrapano of Di Trapano,
Barrett & DiPiero, PLLC, Special Assistant Attorneys General, whose address is 604 Virginia Street,
East, Charleston, West Virginia 25301, an answer, including any related counterclaim you may have,
to the complaint filed against you in the above styled civil action, a true copy of which is hereby
delivered to you.  You are required to serve your answer within twenty (30) days after service of this
summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be
taken against you for the relief demanded in the complaint and you will be thereafter barred for
asserting in another action any claim you may have which must be asserted by counterclaim in the
above styled civil action.

                        Dated:  3/5/10

                                _____
                                Cathy S Gatson
                                By CWood       Clerk of Court

APR. 7. 2010  2:09PM     CIRCUIT CLERK                                          NO. 6616   P. 6

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E
Charleston, WV 25305

FILED

2010 MAR 11 PM 4:52

CATHY S. GATSON, CLERK
KANAW...  CI...  COURT



**Natalie E. Tennant**
Secretary of State
Telephone: 304-558-6000
Toll Free: 866-SOS-VOTE
www.wvsos.com

|  |  |
|---|---|
| Control Number: | 292063 |
| Defendant: | Credit Suisse Securities (USA) LLC |
|  | 3/8/2010 |
| Civil Action: | 10-C-412 |
| Certified: | 91719237900010000225606 |

Cathy Gatson, Circuit Clerk
Kanawha County Courthouse
111 Court Street
Charleston WV 25301-2500

I am enclosing:

| | | |
|---|---|---|
| _____ summons | _____ affidavit | 1 summons and complaint |
| _____ notice | _____ answer | _____ summons returned from post office |
| _____ order | _____ cross-claim | _____ summons and amended complaint |
| _____ petition | _____ counterclaim | _____ 3rd party summons and complaint |
| _____ motion | _____ request | _____ no return from post office |
| _____ suggestions | _____ certified return receipt | _____ notice of mechanic's lien |
| _____ interrogatories | _____ request for production | _____ suggestee execution |
| _____ original | _____ request for admissions | _____ Other |
| _____ subpeona duces tecum | | |

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in your name and on your behalf.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in your name and on behalf as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper. Please do not call the Secretary of State's office.*

Sincerely,

*Natalie E Tennant*

Natalie E. Tennant
Secretary of State

7-8

APR. 7. 2010  2:09PM    CIRCUIT CLERK                         NO. 6616   P. 7

SUMMONS                    FILED

2010 MAR 11 PH 4: 52

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

CATHY S. GATSON, CLERK
KANAWHA CIRCUIT COURT

| | |
|---|---|
| WEST VIRGINIA INVESTMENT MANAGEMENT BOARD | ) |
| | ) |
| Plaintiff | ) CIVIL ACTION NO. _10-C-412_ |
| | ) Bailey |
| v. | ) Summons |
| | ) |
| RESIDENTIAL ACCREDITED LOANS, INC.; RESIDENTIAL FUNDING COMPANY, LLC.; DEUTSCHE BANK SECURITIES (USA) LLC., | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

Type of Service: Secretary of State

To the above-named Defendant:   **CREDIT SUISSE SECURITIES (USA) LLC.**
Corporation Service Company
209 West Washington Street
Charleston, WV 25302

IN THE NAME OF THE STATE OF WEST VIRGINIA, you are hereby summoned and required to serve upon Joshua I. Barrett, J. Timothy DiPiero and Rudolph L. DiTrapano of Di Trapano, Barrett & DiPiero, PLLC, Special Assistant Attorneys General, whose address is 604 Virginia Street, East, Charleston, West Virginia 25301, an answer, including any related counterclaim you may have, to the complaint filed against you in the above styled civil action, a true copy of which is hereby delivered to you. You are required to serve your answer within twenty (30) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint and you will be thereafter barred for asserting in another action any claim you may have which must be asserted by counterclaim in the above styled civil action.

Dated: ___3/4/10___

Cathy S Gatson
Clerk of Court

By Cuwal

APR. 7. 2010  2:10PM   CIRCUIT CLERK                                    NO. 6616   P. 8

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E
Charleston, WV 25305

FILED

2010 MAR 11 PH 4: 53



**Natalie E. Tennant**
Secretary of State
Telephone: 304-558-6000
Toll Free: 866-SOS-VOTE
www.wvsos.com

|  |  |
|---|---|
| ControlNumber: | 292060 |
| Defendant: | Residential Funding Company, LLC |

Cathy Gatson, Circuit Clerk
Kanawha County Courthouse
111 Court Street
Charleston WV  25301-2500

|  |  |
|---|---|
|  | 3/8/2010 |
| Civil Action: | 10-C-412 |
| Certified: | 91719237900010000225576 |

I am enclosing:

| | | |
|---|---|---|
| _____ summons | _____ affidavit | __1__ summons and complaint |
| _____ notice | _____ answer | _____ summons returned from post office |
| _____ order | _____ cross-claim | _____ summons and amended complaint |
| _____ petition | _____ counterclaim | _____ 3rd party summons and complaint |
| _____ motion | _____ request | _____ no return from post office |
| _____ suggestions | _____ certified return receipt | _____ notice of mechanic's lien |
| _____ interrogatories | _____ request for production | _____ suggestee execution |
| _____ original | _____ request for admissions | _____ Other |
| _____ subpeona duces tecum | | |

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in your name and on your behalf.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in your name and on behalf as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper. Please do not call the Secretary of State's office.*

*Sincerely,*

Natalie E. Tennant
Secretary of State

9·10

FILED

**SUMMONS**

2010 MAR 11 PM 4: 53

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

CATHY S. GATSON, CLERK

|  |  |  |
|---|---|---|
| WEST VIRGINIA INVESTMENT MANAGEMENT BOARD | ) ) ) | |
| Plaintiff | ) ) | CIVIL ACTION NO. 10-C-412 |
| v. | ) ) | Bailey |
| | ) | Summons |
| RESIDENTIAL ACCREDITED LOANS, INC.; RESIDENTIAL FUNDING COMPANY, LLC.; DEUTSCHE BANK SECURITIES (USA) LLC., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Type of Service: Secretary of State

To the above-named Defendant:      **RESIDENTIAL FUNDING COMPANY, LLC**
Corporation Service Company
209 West Washington Street
Charleston, WV 25302

IN THE NAME OF THE STATE OF WEST VIRGINIA, you are hereby summoned and required to serve upon Joshua I. Barrett, J. Timothy DiPiero, and Rudolph L. DiTrapano of DiTrapano Barrett & DiPiero, PLLC, Special Assistant Attorneys General, whose address is 604 Virginia Street, East, Charleston, West Virginia 25301, an answer, including any related counterclaim you may have, to the complaint filed against you in the above-styled civil action, a true copy of which is hereby delivered to you. You are required to serve your answer within twenty (30) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint and you will be thereafter barred for asserting in another action any claim you may have which must be asserted by counterclaim in the above styled civil action.

Dated: _____March 4, 2010_____
_____Carolyn Subol_____
                                                                    Clerk of Court

APR. 7. 2010  2:10PM   CIRCUIT CLERK                     NO. 6616   P. 10
                                                            Page 1 of 2



**Allen, Linda**

| | | |
|---|---|---|
| **From:** | Process@wvsos.com [Process@wvsos.com] | **Sent:** Wed 3/17/2010 11:44 AM |
| **To:** | sop_delivered@wvsos.com | |
| **Cc:** | | |
| **Subject:** | Case # 10-C-412 Return Receipt Notification From WV Secretary of State's Office | |
| **Attachments:** | | |

** THIS IS AN AUTOMATED E-MAIL MESSAGE. **
** If you received this message in error, please notify the WV Secretary of State's Office by replying to this message. **

This notification is sent to alert you that a return receipt has been received.
Please find the return receipt in the body of this message below.

To :

RESIDENTIAL FUNDING COMPANY, LLC
CORPORATION SERVICE COMPANY
209 WEST WASHINGTON STREET
CHARLESTON, WV 25302

The letter was sent on 3/8/2010

Civil Action Number: 10-C-412
Restricted: N
Certified Number : 91719237900010002255576

This information supplied from Pitney Bowes Distribution Solutions

APR. 7. 2010  2:10PM    CIRCUIT CLERK                         NO. 6616  P. 11
                                                                   Page 2 of 2

 **UNITED STATES**
**POSTAL SERVICE.**

Date Produced: 03/15/2010

WV SECRETARY OF STATE

The following is the delivery information for Certified Mail™ item number 7192 3790 0010
0022 5576. Our records indicate that this item was delivered on 03/10/2010 at 11:09 a.m. in
CHARLESTON, WV, 25302. The scanned image of the recipient information is provided
below.

Signature of Recipient:    

Address of Recipient:      

Thank you for selecting the Postal Service for your mailing needs. If you require additional
assistance, please contact your local post office or Postal Service representitive.

Sincerely,

United States Postal Service

The customer reference number shown below is not validated or endorsed by the United
States Postal Service. It is solely for customer use.

Customer Reference Number: 3418879 47695721

APR. 7. 2010  2:10PM    CIRCUIT CLERK                              NO. 6616   P. 12
                                                                      Page 1 of 2



## Allen, Linda

| | | | |
|---|---|---|---|
| **From:** | Process@wvsos.com [Process@wvsos.com] | **Sent:** | Wed 3/17/2010 11:44 AM |
| **To:** | sop_delivered@wvsos.com | | |
| **Cc:** | | | |
| **Subject:** | Case # 10-C-412 Return Receipt Notification From WV Secretary of State's Office | | |
| **Attachments:** | | | |

** THIS IS AN AUTOMATED E-MAIL MESSAGE. **
** If you received this message in error, please notify the WV Secretary of State's Office by replying to this message. **

This notification is sent to alert you that a return receipt has been received.
Please find the return receipt in the body of this message below.

To :

RESIDENTIAL ACCREDITED LOANS, INC.
ONE MERIDIAN CROSSINGS
MINNEAPOLIS, MN 554233938

· The letter was sent on 3/8/2010

Civil Action Number: 10-C-412
Restricted: N
Certified Number : 91719237900010000225583

This information supplied from Pitney Bowes Distribution Solutions                13-14

 **UNITED STATES POSTAL SERVICE**

Date Produced: 03/15/2010

WV SECRETARY OF STATE

The following is the delivery information for Certified Mail™ item number 7192 3790 0010
0022 5583. Our records indicate that this item was delivered on 03/12/2010 at 08:38 a.m. in
MINNEAPOLIS, MN, 55423. The scanned image of the recipient information is provided
below.

Signature of Recipient:

Address of Recipient:

Thank you for selecting the Postal Service for your mailing needs. If you require additional
assistance, please contact your local post office or Postal Service representitive.

Sincerely,

United States Postal Service

The customer reference number shown below is not validated or endorsed by the United
States Postal Service. It is solely for customer use.

Customer Reference Number: 3418879 47695721

APR. 7.2010  2:11PM    CIRCUIT CLERK                                    NO. 6616    P. 14
                                                                                   Page 1 of 2



**Allen, Linda**

| | | |
|---|---|---|
| **From:** | Process@wvsos.com [Process@wvsos.com] | **Sent:** Wed 3/17/2010 11:44 AM |
| **To:** | sop_delivered@wvsos.com | |
| **Cc:** | | |
| **Subject:** | Case # 10-C-412 Return Receipt Notification From WV Secretary of State's Office | |
| **Attachments:** | | |

** THIS IS AN AUTOMATED E-MAIL MESSAGE. **
** If you received this message in error, please notify the WV Secretary of State's Office by replying to this message. **

This notification is sent to alert you that a return receipt has been received.
Please find the return receipt in the body of this message below.

To :

CREDIT SUISSE SECURITIES (USA) LLC
CORPORATION SERVICE COMPANY
209 WEST WASHINGTON STREET
CHARLESTON, WV 25302

The letter was sent on 3/8/2010

Civil Action Number: 10-C-412
Restricted: N
Certified Number : 91719237900001000225606

This information supplied from Pitney Bowes Distribution Solutions

15-16

https://mail.courtaux...

APR. 7. 2010  2:11PM   CIRCUIT CLERK                         NO. 6616   P. 15
                                                                    Page 2 of 2



**UNITED STATES**
**POSTAL SERVICE.**

Date Produced: 03/15/2010

WV SECRETARY OF STATE

The following is the delivery information for Certified Mail™ item number 7192 3790 0010
0022 5606. Our records indicate that this item was delivered on 03/10/2010 at 11:09 a.m. in
CHARLESTON, WV, 25302. The scanned image of the recipient information is provided
below.

Signature of Recipient:

Address of Recipient:

Thank you for selecting the Postal Service for your mailing needs. If you require additional
assistance, please contact your local post office or Postal Service representitive.

Sincerely,

United States Postal Service

The customer reference number shown below is not validated or endorsed by the United
States Postal Service. It is solely for customer use.

Customer Reference Number: 3418879 47695721

APR. 7. 2010  2:11PM    CIRCUIT CLERK                    NO. 6616    P. 16
                                                         Page 1 of 2

10-C-412



Allen, Linda

| From: | Process@wvsos.com [Process@wvsos.com] | Sent: Thu 3/25/2010 11:33 AM |
| To: | sop_delivered@wvsos.com | |
| Cc: | | |
| Subject: | Case #: 10-C-412 Return Receipt Notification From WV Secretary of State's Office | |
| Attachments: | | |

** THIS IS AN AUTOMATED E-MAIL MESSAGE. **
** If you received this message in error, please notify the WV Secretary of State's Office by replying to this message. **

This notification is sent to alert you that a return receipt has been received.
Please find the return receipt in the body of this message below.

To

DEUTSCHE BANK SECURITIES, INC
60 WALL ST
NEW YORK, NY 10005

The letter was sent on 3/8/2010

Civil Action Number: 10-C-412
Restricted: N
Certified Number : 91719237900010000225590

This information supplied from Pitney Bowes Distribution Solutions





**UNITED STATES POSTAL SERVICE**

Date Produced: 03/23/2010

WV SECRETARY OF STATE

The following is the delivery information for Certified Mail™ item number 7192 3790 0010 05 5580. Our records indicate that this item was delivered on 03/19/2010 at 12:33 p.m. in NEW YORK, NY, 10258. The scanned image of the recipient information is provided below.

Signature of Recipient:

Address of Recipient:

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,

United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Customer Reference Number  3418879 47695721

FILED

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

2010 APR -1 PM 1:15

WEST VIRGINIA INVESTMENT
MANAGEMENT BOARD,

                  Plaintiff,

    v.

RESIDENTIAL ACCREDITED LOANS,
INC.; RESIDENTIAL FUNDING
COMPANY, LLC; DEUTSCHE BANK
SECURITIES INC.; and CREDIT SUISSE
SECURITIES (USA) LLC,

                  Defendants.

Civil Action No. 10-C-412

CATHY S. GATSON, CLERK
KANAWHA CO CIRCUIT COURT

## VERIFIED APPLICATION FOR PRO HAC VICE ADMISSION

      The undersigned, Jacqueline Sailer, an attorney duly admitted to the practice of law in the

State of New York, hereby makes application for admission *pro hac vice* in accordance with Section

8.0 of the West Virginia State Court Rules for Admission to the Practice of Law, and avers as

follows:

1.     I am seeking admission *pro hac vice* in the matter of *West Virginia Investment Management*

       *Board v. Residential Accredited Loans, Inc.; Residential Funding Company, LLC; Deutsche*

       *Bank Securities Inc.; and Credit Suisse Securities (USA) LLC,* Civil Action No. 10-C-412.

2.     I was admitted and am currently in good standing to practice law in the State of New York. I

       was also admitted and am currently in good standing in the State of Delaware as an inactive

       member of the Delaware State bar.

3.     I am currently a partner in the law firm of Murray, Frank & Sailer LLP in the State of New

1

York.

4.    I have not been disciplined by either the New York or Delaware State Bars in the past

twenty-four (24) months.

5.    The address and telephone number for the registration agency of the New York State courts

are:

          New York State Unified Court System
          Office of Court Administration
          25 Beaver Street, Room 840
          New York, New York 10004
          Telephone: 212-428-2800

The address and telephone number for the registration agency of the Delaware State courts

are:

          Delaware Supreme Court Clerk
          Delaware Supreme Court
          P.O. Box 476
          Dover, Delaware 19903
          Telephone: 302-739-4155

6.    Joshua I. Barrett of the law firm of Di Trapano, Barrett & DiPiero, PLLC will be the

responsible local attorney in this matter.  His firm's address is 604 Virginia St., E.,

Charleston, WV, 25301, West Virginia State Bar No. 1024.

7.    I have been involved in no matters before the West Virginia Circuit Courts in the preceding

twenty-four (24) months.

8.    My firm has been involved in no matters in the preceding twenty-four (24) months in the

State of West Virginia courts.

9.    I hereby agree to comply with all laws, rules and regulations of West Virginia's state and

local governments and any standards for pro bono, civil, criminal, indigent, defense legal

2

services.

10. I hereby certify that a copy of this verified application for *pro hac vice* has been mailed to the

West Virginia Supreme Court, together with the required $250.00 fee.

11. I respectfully request that this Court grant my application for admission *pro hac vice* in the

above styled matter.

Jacqueline Sailer, Esquire

Murray, Frank & Sailer LLP
275 Madison Avenue
Suite 801
New York, NY 10016
Telephone: 212-682-1818
*Co-Counsel for Plaintiff*

Endorsed by:

Joshua I. Barrett, Esquire (WVSB#252)

3

# VERIFICATION

STATE OF NEW YORK,
COUNTY OF NEW YORK, to-wit:

JACQUELINE SAILER, the applicant named in the foregoing and hereto annexed **Verified**

**Application for** *Pro Hac Vice* **Admission**, having been first duly sworn, says that she has read the

application and further says that the facts and allegations contained therein are true, except so far as

they are therein stated to be upon information, and insofar as they are stated to be upon information,

she believes them to be true,

_____
Jacqueline Sailer, Esquire

Taken, subscribed and sworn to before me
this 9th day of March, 2010.
My commission expires  12/3/11    .

BRIDGET V. HAMILL
Notary Public, State of New York
No. 02HA6178573
Qualified in New York County
Commission Expires Dec. 3, 20 11

(SEAL)

_____
NOTARY PUBLIC

4

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

FILED

WEST VIRGINIA INVESTMENT
MANAGEMENT BOARD,

                         Plaintiff,

          v.

RESIDENTIAL ACCREDITED LOANS,
INC.; RESIDENTIAL FUNDING
COMPANY, LLC; DEUTSCHE BANK
SECURITIES INC.; and CREDIT SUISSE
SECURITIES (USA) LLC,

                         Defendants.

2010 APR -1  PM 1: 15

Civil Action No. 10-C-412

CATHY S. GATSON, CLERK
KANAWHA CO. CIRCUIT COURT

## VERIFIED APPLICATION FOR PRO HAC VICE ADMISSION

      The undersigned, Gregory Linkh, an attorney duly admitted to the practice of law in the State

of New York, hereby makes application for admission *pro hac vice* in accordance with Section 8.0 of

the West Virginia State Court Rules for Admission to the Practice of Law, and avers as follows:

1.      I am seeking admission *pro hac vice* in the matter of *West Virginia Investment Management*

        *Board v. Residential Accredited Loans, Inc.; Residential Funding Company, LLC; Deutsche*

        *Bank Securities Inc.; and Credit Suisse Securities (USA) LLC*, Civil Action No. 10-C-412.

2.      I was admitted and am currently in good standing to practice law in the State of New York.

3.      I am currently associated with the law firm of Murray, Frank & Sailer LLP in the State of

        New York.

4.      I have not been disciplined by the New York Bar in the past twenty-four (24) months.

1

5.      The address and telephone number for the registration agency of the New York State courts

        are:

                New York State Unified Court System
                Office of Court Administration
                25 Beaver Street, Room 840
                New York, New York 10004
                Telephone: 212-428-2800

6.      Joshua I. Barrett of the law firm of Di Trapano, Barrett & DiPiero, PLLC will be the

        responsible local attorney in this matter.  His firm's address is 604 Virginia St., E.,

        Charleston, WV, 25301, West Virginia State Bar No. 1024.

7.      I have been involved in no matters before the West Virginia Circuit Courts in the preceding

        twenty-four (24) months.

8.      Murray, Frank & Sailer LLP has been involved in no matters in the preceding twenty-four

        (24) months in the State of West Virginia courts.

9.      I hereby agree to comply with all laws, rules and regulations of West Virginia's state and

        local governments and any standards for pro bono, civil, criminal, indigent, defense legal

        services.

10.     I hereby certify that a copy of this verified application for *pro hac vice* has been mailed to the

        West Virginia Supreme Court, together with the required $250.00 fee.

2

APR. 7. 2010  2:12PM    CIRCUIT CLERK                    NO. 6616   P. 24

11.     I respectfully request that this Court grant my application for admission *pro hac vice* in the

above styled matter.

Gregory Linkh, Esquire

Murray, Frank & Sailer LLP
275 Madison Avenue
Suite 801
New York, NY 10016
Telephone: 212-682-1818
*Co-Counsel for Plaintiff*

Endorsed by:

Joshua T. Barrett, Esquire (WVSB # 252)

3

## VERIFICATION

STATE OF NEW YORK,
COUNTY OF NEW YORK, to-wit:

GREGORY LINKH, the applicant named in the foregoing and hereto annexed **Verified**

**Application for** *Pro Hac Vice* **Admission**, having been first duly sworn, says that he has read the

application and further says that the facts and allegations contained therein are true, except so far as

they are therein stated to be upon information, and insofar as they are stated to be upon information,

he believes them to be true.

Gregory Linkh, Esquire

Taken, subscribed and sworn to before me
this 9th day of March, 2010.
My commission expires 12/3/11      .

(SEAL)        BRIDGET V. HAMILL
              Notary Public, State of New York
              No. 02HA6178573
              Qualified in New York County
              Commission Expires Dec. 3, 20 11

                                    NOTARY PUBLIC

4